## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **HOOTERS OF AMERICA, LLC**, a Georgia limited liability company, **HOA SYSTEMS, LLC**, a Delaware limited liability company, and **HI LIMITED PARTNERSHIP**, a Florida limited partnership, | ) ) ) ) ) )   CIVIL ACTION NO. ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| **HOOT OWL RESTAURANTS, LLC**, a Delaware limited liability company, | ) ) ) |
| Defendant. | ) ) |

## COMPLAINT

Plaintiffs Hooters of America, LLC ("HOA LLC"), HOA Systems, LLC ("HOA Systems"), and HI Limited Partnership ("HILP") file their Complaint against Defendant Hoot Owl Restaurants, LLC ("Hoot Owl"), and state as follows:

### Nature of Action

1.

HOA Systems seeks a declaration of its rights in connection with the termination of its franchise agreement with Hoot Owl as a result of Hoot Owl's

willful and material breaches of the agreement. According to its express terms, the parties' franchise agreement is governed by Georgia law, but because Hoot Owl operates Hooters franchised restaurants in Delaware, Rhode Island, Pennsylvania, and New Jersey, there is an actual controversy as to which state's laws apply to the termination of the franchise agreement. Thus, HOA Systems seeks a declaration that Georgia law governs this matter pursuant to the choice of law provision in the franchise agreement, and that under Georgia law, HOA is entitled to immediately terminate all of Hoot Owl's rights under the franchise agreement based on Hoot Owl's defaults under Section XIII, Paragraphs A.16, for abandoning its Hooters franchised restaurants, and Paragraph A.17, for willfully breaching the franchise agreement.

2.

Alternatively, should the Court determine that Georgia law does not govern this matter in its entirety, HOA Systems seeks a declaration as to whether and in what way(s) the franchise relationship statutes in Delaware, Rhode Island, and New Jersey apply to the termination of Hoot Owl's rights under the franchise agreement with respect to its Hooters franchised restaurants in each of those states, respectively, and whether Georgia law governs the termination of Hoot Owl's rights under the franchise agreement with respect to its Hooters franchised

restaurants in Pennsylvania, which does not have a franchise relationship statute, and/or in any other states. At a minimum, the Court should enter a declaratory judgment that Hoot Owl's willful and material breaches of the franchise agreement constitute good cause for termination under any applicable franchise relationship statute, and that HOA was entitled to terminate Hoot Owl's rights under the franchise agreement with respect to its Hooters franchised restaurants in Pennsylvania immediately based on Hoot Owl's defaults under Section XIII, Paragraphs A.16 and A.17.

3.

In addition, Plaintiffs seek injunctive and other relief, including damages, for Hoot Owl's post-termination trademark infringement under the trademark laws of the United States, for unfair competition, and for breach of contract with respect to Hoot Owl's restaurants in Pennsylvania. Plaintiffs seek, among other things, a preliminary and permanent injunction (i) enjoining Hoot Owl's post-termination use of HILP's federally registered trademarks in Pennsylvania, and (ii) enforcing certain of the post-termination obligations set forth in the franchise agreement between HOA Systems and Hoot Owl with respect to the Pennsylvania restaurants. Plaintiffs also seek damages for Hoot Owl's infringement and breaches of contract, as well as the attorneys' fees and costs they have incurred and will incur in

prosecuting this action, as provided by statute and the parties' written franchise agreement.

## Parties

4.

Plaintiff HOA LLC is a Georgia limited liability company with its principal place of business and corporate headquarters located at 1815 The Exchange SE, Atlanta, Georgia 30339, which is located in Cobb County. HOA LLC is the successor entity to Hooters of America, Inc., a Georgia corporation, and the successor-in-interest to Hooters of America, Inc. with respect to the agreements entered by Hooters of America, Inc. referenced herein.

5.

Plaintiff HOA Systems is a Delaware limited liability company with its principal place of business and corporate headquarters located at 1815 The Exchange SE, Atlanta, Georgia 30339. HOA Systems is the successor-in-interest to Hooters of America, Inc. and HOA LLC with respect to the agreements entered by Hooters of America, Inc. referenced herein.

6.

Plaintiff HILP is a Florida limited partnership with its principal place of business and corporate headquarters located at 1815 The Exchange SE, Atlanta, Georgia 30339.

7.

Upon information and belief, Defendant Hoot Owl is a Delaware limited liability company with its principal place of business located at 337 East Main Street, Newark, Delaware 19711.

## Jurisdiction and Venue

8.

This action arises under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, the Declaratory Judgment Act, 28 U.S.C. § 2201, and under the common-law.

9.

This Court has original subject matter jurisdiction under 15 U.S.C. § 1121, and under 28 U.S.C. §§ 1331, 1338(a), and 1367, in that this is a civil action involving claims arising under the laws of the United States, including an Act of Congress relating to trademarks, and wherein all other claims are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy.

10.

This Court has personal jurisdiction over Defendant because it has agreed by contract to submit to the jurisdiction of this Court. In addition, Defendant is subject to personal jurisdiction in this Court under the Georgia long-arm statute, O.C.G.A. § 9-10-91(1).

11.

Venue is proper in this Court because, under the terms of the franchise agreement between HOA Systems and Hoot Owl, as well as multiple other agreements involving the parties, Defendant agreed that the claims asserted by Plaintiffs in this matter would be resolved in the state and federal courts in Georgia.

## Factual Background

**A.    Plaintiffs' Registered Trademarks and Service Marks**

12.

HOA Systems is the Atlanta, Georgia based franchisor of Hooters restaurants.

13.

HOA Systems is the licensee of a family of federally registered marks owned by HILP, which are the subject of this Complaint, and include: "Hooters"

(for example, U.S. Registration No. 1,557,380) and "Hooters & Owl Design" (for example, U.S. Registration No. 1,320,029) (the "Hooters Marks"). HOA Systems has the right to license the Hooters Mark to other parties.

14.

Each of the Hooters Marks, including the foregoing trademarks, are registered in, among other things, International Classes 16, 25, and 43, and are incontestable within the meaning of 15 U.S.C. § 1065.

15.

HOA Systems and its affiliates are in the business of operating and franchising casual, bar-and-grill restaurants under the Hooters Marks. In conducting this business, HOA Systems has developed a distinctive system (the "Hooters System") featuring a distinctive exterior and interior restaurant design, trade dress décor and color scheme, uniform standards, specifications, and procedures for operations.

16.

Plaintiffs and their affiliates or predecessors have used the Hooters Marks since 1983 and continue to use the Hooters Marks in interstate commerce.

17.

The Hooters Marks are inherently distinctive, and have acquired distinction and fame for Plaintiffs as the center of their advertising and marketing campaign and distinctive franchise operations. Plaintiffs use the Hooters Marks in commerce, and expend substantial funds each year advertising their products and services and promoting their business using the Hooters Marks. Among other things, Plaintiffs use the Hooters Marks to advertise and market their products and services over the internet, in print, and in other media, and in the operations of Hooters franchised restaurants.

18.

The Hooters Marks are widely recognized by the general consuming public as a designation of source of the goods and services of Plaintiffs and their licensed franchisees. Over the years, Plaintiffs have further strengthened this association through targeted advertising and marketing efforts directed at racing and sports enthusiasts. This includes, for example, the use of the Hooters Marks in connection with sports events and racing events.

**B.     The Parties' Written Franchise Agreement**

*1.     Execution of the Franchise Agreement*

19.

On or about May 23, 1996, Hooters of America, Inc, the predecessor-in-interest of HOA Systems, entered into a written franchise agreement with Hoot Owl (the "Franchise Agreement"). The Franchise Agreement granted Hoot Owl the right to open and operate certain identified Hooters franchised restaurants, and Hoot Owl was authorized and required to use the Hooters Marks and Hooters System in the operation of the restaurants during the term of the license granted in the Franchise Agreement. A true and correct copy of the Franchise Agreement is attached hereto as Exhibit A.

20.

Hoot Owl opened and operated Hooters franchised restaurants at various locations in Delaware, Pennsylvania, Rhode Island, and New Jersey.

21.

At the time of the events giving rise to this Complaint, Hoot Owl operated a total of twelve Hooters franchised restaurants with locations in New Castle, Rehoboth Beach, and Newark, Delaware; King of Prussia, Philadelphia, and

Concordville, Pennsylvania; Warwick, Rhode Island; and Paramus, Atlantic City, Lawrenceville, Hackensack, and East Brunswick, New Jersey.

22.

Each of Hoot Owl's Hooters franchised restaurants were subject to the single Franchise Agreement between HOA Systems and Hoot Owl. Hoot Owl was authorized to use the Hooters Marks with respect to each restaurant only pursuant to the license granted in the Franchise Agreement.

23.

The Franchise Agreement expressly provides that it "shall be interpreted and construed under the laws of the State of Georgia which laws shall prevail in the event of any conflict of law." *See* Franchise Agreement, § XXIV, ¶ A (p. 49).

24.

Under the terms of the Franchise Agreement, the parties expressly agreed that "any action brought by either party against the other in any court, whether federal or state, may, at the option of Hooters of America, be brought within the State of Georgia in the judicial circuit or district in which Hooters of America has its principal place of business and Franchisee does hereby agree to and submit to such jurisdiction and does hereby waive all questions of personal jurisdiction or venue for the purpose of carrying out this provision." *See id*, § XXIV, ¶ B (p. 49).

25.

Hooters of America, Inc.'s rights under the Franchise Agreement, including all subsequent amendments and addenda thereto, were assigned to HOA LLC, as the successor entity to Hooters of America, Inc., and were subsequently assigned to HOA Systems.

2.    *Hoot Owl's Obligations Under the Franchise Agreement*

26.

Among other required fees, the Franchise Agreement required Hoot Owl to pay HOA Systems a royalty fee of six percent (6%) of the gross sales, as defined in the Franchise Agreement, of any franchised restaurant opened pursuant to the Franchise Agreement ("Royalty Fees") within ten days from the end of each four-week period. *See* Franchise Agreement, § IV, ¶ B (p. 6).

27.

The Franchise Agreement, as subsequently amended, also required Hoot Owl to pay HOA Systems a national advertising fee of one and one-half percent (1.5%) of the gross sales, as defined in the Franchise Agreement, of any franchised restaurant opened pursuant to the Franchise Agreement ("National Advertising Fees") within ten days from the end of each four-week period.

28.

Under the Franchise Agreement, Hoot Owl is required to "keep the business open and in normal operation for a minimum of seven (7) days a week, fifty-two (52) weeks per year…except Thanksgiving and Christmas. Such minimum hours and days of operation may be changed as Hooters of America may from time to time specify in the Manual or as Hooters of America may otherwise approve in writing (subject to local ordinances or lease restrictions, if any)[.]" *See* Franchise Agreement, § V, ¶ J.

29.

The Franchise Agreement provided:

> …In the event the building shall be damaged or destroyed by fire or other casualty, or be required to be repaired or reconstructed by any governmental authority, Franchisee shall commence the required repair or reconstruction of the building within ninety (90) days from the date of such casualty or notice of such governmental requirement (or such lesser period as shall be designated by such governmental requirement) and shall complete all required repair or reconstruction as soon as possible thereafter, in continuity, but in no event later than one hundred eighty (180) days from the date of such casualty or requirement of such governmental notice. The minimum acceptable appearance for the restored building will be that which existed just prior to the casualty; however, every effort should be made to have the restored building include the then-current image, design and specifications of new entry Hooters Restaurants.…

*See id.*, § I, ¶ D (p. 3).

30.

Under the Franchise Agreement, Hoot Owl agreed that:

…every detail of the Franchise Business, including the uniformity of appearance, service, products and advertising of the Hooters System, is important to Franchisee, Hooters of America, the Hooters System, and other Hooters of America franchisees in order to maintain high and uniform operating standards, to increase the demand for the products and services sold by all franchisees, and to protect Hooters of America's reputation and goodwill.

*See id.*, § V, ¶ A (pp. 7–8).

31.

Under the Franchise Agreement, Hoot Owl was required to:

…maintain the Restaurant in a first class repair and condition in accordance with all maintenance and operating standards set forth in the Manual. In connection therewith, Franchisee shall make such additions, alterations, repairs, and replacements thereto (but no others without Hooters of America's prior written consent) as may be required for that purpose, including, without limitation, such periodic repainting, repairing, and replacing of obsolete signs, fixtures, and furnishings as Hooters of America may reasonably direct.

*See id.*, § V, ¶ K (p. 13).

32.

Under the Franchise Agreement, Hoot Owl was required to "operate and maintain the Restaurant and all exterior areas at the Approved Location in a clean and neat manner." *See id.*, § V, ¶ M (p. 13).

13

33.

The Franchise Agreement provided that Hoot Owl:

…shall not engage in any trade practice or other activity…which Franchisor determines to be harmful to the goodwill or to reflect unfavorably on the reputation of Franchisee or Hooters of America, the Restaurant, or the products sold thereat;…

*See id.*, § V, ¶ U (p. 16).

34.

Under the Franchise Agreement, Hoot Owl agreed that "Hooters of America has the exclusive right and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them," and that Hoot Owl "shall not directly or indirectly contest the validity, distinctiveness, the ownership or Hooters of America's right to license the Proprietary Marks." *See id.*, § VI, ¶ C (p. 19).

35.

Under the Franchise Agreement, Hoot Owl was required to "use only the Proprietary Marks designated by Hooters of America, and shall use them only in the manner authorized and permitted by Hooters of America," and Hoot Owl's "right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Hooters of America's rights." *See id.*, § VI, ¶ B (p. 18).

3.      *The Franchise Agreement's Termination and Liquidated Damages Provisions*

36.

Under the Franchise Agreement, Hoot Owl "shall be deemed to be in default…and all rights granted herein shall automatically terminate without notice to" Hoot Owl, if Hoot Owl "at any time ceases to operate or otherwise abandons the Franchised Business, or otherwise forfeits the right to do or transact business in the jurisdiction where the Restaurant is located[.]" *See id.*, § XIII, ¶ A.16 (pp. 33–35).

37.

Under the Franchise Agreement, Hoot Owl "shall be deemed to be in default…and all rights granted herein shall automatically terminate without notice to" Hoot Owl, "[i]n the event of the gross negligence or willful breach of this Franchise Agreement by the Franchisee, or any of the principals of the Franchisee, in the breach of any of the covenants of the Franchisee contained in this Agreement." *See id.*, § XIII, ¶ A.17 (pp. 33–35).

38.

Hoot Owl agreed that, upon termination of the Franchise Agreement, it would, among other things: (i) immediately cease operating its Hooters franchised restaurants and holding itself out to the public as present or former Hooters

franchisees; (ii) immediately and permanently cease using any marks, trade secrets, signs, symbols, confidential methods, or other materials associated with Hooters or belonging to HOA Systems; (iii) immediately deliver to HOA Systems all information, documents, and copies thereof which are proprietary to HOA Systems or relate to the operation of the franchised business; and (iv) immediately cease using the proprietary Hooters System. *See id.*, § XIV(pp. 38–40).

39.

Hoot Owl also agreed that, upon termination of the Franchise Agreement, it would promptly pay to HOA Systems (i) all sums owing to HOA Systems accrued through the effective date of termination following performance of Hoot Owl's post-termination covenants; (ii) liquidated damages in an amount equal to the fees payable to HOA Systems for the thirteen (13) four (4)-week periods prior to the date of notice of termination; (iii) all costs and expenses, including reasonable attorneys' fees, incurred by HOA Systems as a result of the default. *See id.*, § XIV, ¶ E (pp. 39–40).

40.

Hoot Owl also agreed that "the damage to Franchisor from Franchisee's default hereunder would be difficult or impossible to accurately determine, and that the sums payable by Franchisee to Franchisor, as herein provided, are a

16

reasonable estimate of Franchisor's damages and does not constitute a penalty." *See id.*, § XIV, ¶ E (pp. 39–40).

41.

Hoot Owl also agreed to pay HOA Systems "all damages, costs, and expenses, including reasonable attorney's fees, incurred by Hooters of America in obtaining injunctive or other relief for the enforcement of" Hoot Owl's post-termination covenants. *See id.*, § XIV, ¶ F (p. 40).

## C.    Hoot Owl's Material Breaches of the Franchise Agreement

### 1.    *Hoot Owl's Abandonment of the Rehoboth Restaurant*

42.

One of the Hooters franchised restaurants operated by Hoot Owl was located at 70 Rehoboth Avenue, #207, Rehoboth Beach, Delaware 19971 (the "Rehoboth Restaurant").

43.

Hoot Owl willfully breached the Franchise Agreement, by among other conduct, ceasing to operate and abandoning the Rehoboth Restaurant. *See* Franchise Agreement, § XIII, ¶¶ A.16, A.17. (pp. 33–35).

44.

With the permission of HOA Systems, Hoot Owl operated the Rehoboth Restaurant on a seasonal basis. The Rehoboth Restaurant opened each year in or around Period 5 and closed for the season in or around Period 10. Until this year, Hoot Owl always re-opened the Rehoboth Restaurant by the end of Period 5, which ended on May 15, 2016, in time for the summer season.

45.

In breach of the Franchise Agreement, and without any authorization from HOA Systems, Hoot Owl failed to reopen the Rehoboth Restaurant for the 2016 season and has abandoned the Rehoboth Restaurant.

46.

On May 15, 2016, Jim Marr, Plaintiffs' Franchise Business Director, sent an email to Phillip Moran, Hoot Owl's CEO, to inquire as to when Hoot Owl would reopen the Rehoboth Restaurant for the 2016 season. A true and correct copy of Mr. Marr's May 15, 2016 email to Mr. Moran is included in Exhibit B.

47.

Mr. Moran did not reply to Mr. Marr's May 15, 2016 email until ten days later, on May 25, 2016, when Mr. Moran stated that Hoot Owl would not be

reopening the Rehoboth Restaurant for the 2016 season. A true and correct copy of Mr. Moran's May 25, 2016 email to Mr. Marr is included in Exhibit B.

48.

The space in which the Rehoboth Restaurant was located has been abandoned by Hoot Owl and is now vacant, and all Hooters signs have been removed from the Rehoboth Restaurant. True and correct copies of photographs of the Rehoboth Restaurant, taken on or about May 20, 2016, are attached hereto as Exhibit C.

49.

Hoot Owl maintained a Facebook page for the Rehoboth Restaurant, intended to present that restaurant to the public, which states that the Rehoboth Restaurant is "Permanently Closed." A true and correct copy of a screenshot of the Rehoboth Restaurant's Facebook page, taken on May 19, 2016, is attached hereto as Exhibit D.

50.

A disappointed guest left a comment on the Rehoboth Restaurant's Facebook page stating:

> our family went to this location last summer.  it [sic] was great. my [sic] daughter had her picture taken with two of the waitresses . . . we were looking forward to coming back to this location this summer when it opened.  we [sic] were disappointed to find out the building is

up for lease.  we [sic] walk by it everyday nd [sic] hope its [sic] not true nd [sic] that its [sic] going to reopen.  I hope it does.

*See* Ex. D. As evidenced by this customer's comment, Hoot Owl's abandonment of the Rehoboth Restaurant is damaging to the Hooters brand.

51.

Upon information and belief, the telephone number for the Rehoboth Restaurant is no longer in service.

52.

Upon information and belief, the space in which the Rehoboth Restaurant was located has been made available for re-leasing.

53.

Hoot Owl's abandonment of the Rehoboth Restaurant is a willful and material breach of the Franchise Agreement and is not capable of being cured.

54.

Hoot Owl has materially impaired the goodwill associated with the Hooters Marks by abandoning the Rehoboth Restaurant.

55.

Hoot Owl's willful and material breach of the Franchise Agreement entitles HOA Systems to terminate the entire Franchise Agreement, including Hoot Owl's

right to operate any of its Hooters franchised restaurants, not only the Rehoboth

Restaurant. *See* Franchise Agreement, § XIII, ¶¶ A.16, A.17. (pp. 33–35).

2.   *Hoot Owl's Abandonment of the Warwick Restaurant*

56.

Another of the Hooters franchised restaurants operated by Hoot Owl was

located at 667 Airport Road, Warwick, Rhode Island 02886 (the "Warwick

Restaurant").

57.

Hoot Owl willfully allowed the condition of the Warwick Restaurant to

severely deteriorate.

58.

In August 2013, Plaintiffs received a customer complaint which stated:

…In the last year the place has really gone to hell. As soon as you
enter, the window panes on the front door looks like they haven't been
cleaned in 6 months. The men's restroom has a strong stench of urine.
The toilet which is crooked & cracked has a tank top that has been
repaired w/duct tape & has been there for a while. The floors in the
main room are buckling & floor slates are missing, I tripped on one…

A true and correct copy of the complaint is attached hereto as Exhibit E.

59.

Despite repeated assurances from Hoot Owl, the Warwick Restaurant was

not remodeled and the condition of the restaurant worsened.

21

60.

The Warwick Restaurant was in such deplorable condition in July 2014 that Hoot Owl "voluntarily" closed the restaurant in order to perform necessary repairs and maintenance following a health department inspection on or about July 25, 2014. True and correct copies of reports from the Rhode Island Health Department are attached hereto as Exhibit F.

61.

On or about August 1, 2014, Hoot Owl assured Plaintiffs via email that it would start the remodeling process for the Warwick Restaurant, as required by the Franchise Agreement. A true and correct copy of the email is attached hereto as Exhibit G. Despite this assurance, no remodeling occurred.

62.

During a storm in the winter of 2015, the Warwick Restaurant suffered roof damage and it has remained closed since that time.

63.

Under the Franchise Agreement, Hoot Owl was required to commence repairs or reconstruction within 90 days from the date of the storm damage, and was required to complete such repairs or reconstruction within 180 days from the date of the storm damage. *See* Franchise Agreement, § I, ¶ D (p. 3).

64.

Well over 180 days have passed since the storm in the winter of 2015, and the repairs or reconstruction of the Warwick Restaurant have not been completed or, indeed, even started.

65.

Hoot Owl has allowed the Warwick Restaurant to remain closed, with the Hooters signs and Hooters Marks still displayed on the outside of the building, since early 2015. The Hooters sign in front of the Warwick Restaurant reads, with several letters having fallen off, "DUE TO NO DAMAGES W." A paper sign taped to the door of the Warwick Restaurant bears the Hooters Marks and reads:

> WE ARE CLOSED! We apologize for the abrupt closure, but due to damage our roof has sustained from the excessive snow this season, we must perform immediate repair. We'll move as quickly as possible and will keep you notified on when we'll be able to open again! Thank you, Hooters Management.

True and correct copies of photographs of the Warwick Restaurant, taken on or about May 20, 2016, are attached hereto as Exhibit H.

66.

Hoot Owl willfully breached the Franchise Agreement by, among other conduct, failing to complete repairs or reconstruction of the Warwick Restaurant

within 180 days. *See* Franchise Agreement, § I, ¶ D (p. 3); *id.*, § § XIII, ¶¶ A.17. (pp. 33–35).

67.

Hoot Owl has abandoned the Warwick Restaurant.

68.

Hoot Owl willfully breached the Franchise Agreement by ceasing to operate and abandoning the Warwick Restaurant. *See id.*, § XIII, ¶¶ A.16, A.17. (pp. 33–35).

69.

Hoot Owl's failure to complete repairs or reconstruction of the Warwick Restaurant within 180 days and abandonment of the Warwick Restaurant is a willful and material breach of the Franchise Agreement and is not capable of being cured.

70.

Hoot Owl has materially impaired the goodwill associated with the Hooters Marks by allowing the Warwick Restaurant to remain in its current condition and failing to repair and re-open the restaurant.

71.

Hoot Owl's willful and material breaches of the Franchise Agreement entitle HOA Systems to terminate the entire Franchise Agreement, including Hoot Owl's right to operate any of its Hooters franchised restaurants, not only the Warwick Restaurant. *See* Franchise Agreement, § XIII, ¶¶ A.16, A.17. (pp. 33–35).

3.    *Notice of Default and Termination*

72.

On June 6, 2016, HOA Systems sent Hoot Owl a Notice of Default and Termination ("Termination Notice"), putting Hoot Owl on notice that it had breached the Franchise Agreement (i) by abandoning the Rehoboth Restaurant, (ii) by willfully failing to complete repairs or reconstruction of the Warwick Restaurant, and by (iii) abandoning the Warwick Restaurant, and that Hoot Owl's defaults constituted good cause for termination of the Franchise Agreement and all rights thereunder. A true and correct copy of the Termination Notice is attached hereto as <u>Exhibit I</u>.

73.

The Termination Notice provided that, under Georgia law, all of Hoot Owl's rights under the Franchise Agreement related to its Hooters franchised restaurants in Pennsylvania were immediately terminated. Out of an abundance of caution,

25

however, the Termination Notice provided that HOA Systems would forebear from acting on its rights to terminate the Franchise Agreement with regard to Hoot Owl's Hooters franchised restaurants in Delaware, Rhode Island, and New Jersey until this Court has issued the declaratory relief sought in this Complaint. *See* Termination Notice.

74.

The Termination Notice demanded that Hoot Owl comply with its post-termination covenants under the Franchise Agreement with regard to its terminated Pennsylvania restaurants, including its obligation to pay liquidated damages to HOA Systems, to cease operating its Hooters franchised restaurants in Pennsylvania, and to cease using the Hooters Marks in Pennsylvania. *See* Termination Notice.

**D.     Hoot Owl's Infringement of the Hooters Marks**

75.

At a minimum, under Georgia law, Hoot Owl's franchise rights with respect to its Hooters franchised restaurants in Pennsylvania have terminated.

76.

Hoot Owl continues to use the Hooters Marks and Hooters System in connection with the operation of its restaurants in Pennsylvania, to market and

promote its restaurants in Pennsylvania, to hold its restaurants in Pennsylvania out to the public as authorized Hooters franchised restaurants, and pass-off its Pennsylvania restaurants as being authorized by Plaintiffs when they are not.

77.

Hoot Owl's continued use of the Hooters Marks in Pennsylvania is without the license or consent of Plaintiffs and has caused or is likely to cause mistake, confusion, or deception in the minds of the public as to source, affiliation, and sponsorship.

78.

In addition to the fact that both Hoot Owl and Plaintiffs offer the identical products at their restaurants, the products provided by Hoot Owl using the Hooters Marks are offered to the same class of consumers as those who patronize authorized Hooters franchised restaurants. Upon seeing the familiar Hooters Marks through Hoot Owl's unauthorized use thereof, consumers will be deceived into concluding that Hoot Owl's restaurants in Pennsylvania, and the products and services offered and sold in connection therewith, are subject to Plaintiffs' supervision, are sponsored or endorsed by Plaintiffs, and bear the Hooters Marks pursuant to Plaintiffs' authority and permission.

27

79.

So long as Hoot Owl continues to use the Hooters Marks in connection with the operation of its restaurants in Pennsylvania, consumers have no practical way of knowing that Hoot Owl's former Hooters franchised restaurants in Pennsylvania are no longer affiliated with, or sponsored, authorized, or endorsed by, Plaintiffs. As a result, any consumer dissatisfaction with Hoot Owl's restaurants in Pennsylvania, or with the products and services offered in connection therewith, will be attributed to Plaintiffs and the entire Hooters network.

80.

Hoot Owl has received actual notice of their violation and infringement of the Hooters Marks and have constructive notice of Plaintiffs' rights in the Hooters Marks and the registrations thereof pursuant to 15 U.S.C. § 1072. *See* Franchise Agreement, § VI (pp. 17–20). Hoot Owl's continued infringement is willful, malicious, fraudulent, and deliberate.

81.

HOA Systems has complied in all material respects with and performed all of its obligations under the Franchise Agreement.

## Count I
## Declaratory Judgment

82.

The allegations of the preceding paragraphs are repeated and incorporated herein as if set out in full.

83.

An actual controversy exists as to which state's laws apply to the termination of the Franchise Agreement, and the parties' rights thereunder, as a result of the defaults set forth above.

84.

The Franchise Agreement expressly provides that it "shall be interpreted and construed under the laws of the State of Georgia which laws shall prevail in the event of any conflict of law." *See* Franchise Agreement, § XXIV, ¶ A (p. 49).

85.

Under the express terms of the Franchise Agreement, all of Hoot Owl's rights thereunder "shall automatically terminate without notice" as a result of the defaults set forth above. *See id.*, § XIII, ¶¶ A.16, A.17 (pp. 33–35).

86.

Georgia law does not require franchisors to give franchisees any additional notice nor opportunity to cure prior to termination and, therefore, if this matter is

29

governed by Georgia law, the Franchise Agreement and all of Hoot Owl's rights thereunder immediately and automatically terminated without notice upon the defaults set forth above.

87.

The termination of the Franchise Agreement is the result of Hoot Owl's abandonment of the Rehoboth Restaurant, which is located in Delaware. Under the Delaware Franchise Security Law, "[n]otwithstanding any provision in a franchise agreement which provides otherwise, any termination of a franchise…must be made on at least 90 days' notice." *See* 6 Del.C. § 2555.

88.

Therefore, to the extent that Delaware law applies, HOA Systems is not required to give Hoot Owl an opportunity to cure its defaults, and HOA Systems is entitled to terminate all of Hoot Owl's rights under the Franchise Agreement with respect to its Hooters franchised restaurants located in Delaware with 90 days' notice. *See* 6 Del.C. § 2555.

89.

The termination of the Franchise Agreement is also the result of Hoot Owl's failure to complete repairs or reconstruction of and abandonment of the Warwick Restaurant, which is located in Rhode Island. Under the Rhode Island Fair

Dealership Act, "a grantor shall provide a dealer sixty (60) days prior, written notice of termination," and the notice "shall provide that the dealer has thirty (30) days in which to cure any claimed deficiency[.]" *See* RI ST § 6-50-4(a). The 60-day notice and 30-day right to cure provisions do not apply, however, if the reason for termination is that the franchisee "[v]oluntarily abandons the dealership relationship," or "[e]ngages in any substantial act that tends to materially impair the goodwill of the grantor's trade name, trademark, service mark, logotype, or other commercial symbol[.]" *See id.*

90.

Hoot Owl has voluntarily abandoned the Warwick Restaurant, and its conduct with respect to the Warwick Restaurant has materially impaired the goodwill associated with the Hooters Marks by allowing the Warwick Restaurant to remain in its current condition.

91.

Therefore, to the extent that Rhode Island law applies, HOA Systems is not required to give Hoot Owl an opportunity to cure its defaults, and HOA Systems is entitled to terminate all of Hoot Owl's rights under the Franchise Agreement with respect to its Hooters franchised restaurants located in Rhode Island immediately. *See* RI ST § 6-50-4(a)

92.

Hoot Owl also owns and operates Hooters franchised restaurants in Pennsylvania and New Jersey, the rights to which are also subject to termination of the Franchise Agreement for the defaults set forth above.

93.

Like Georgia, Pennsylvania has no franchise relationship statute. Therefore, to the extent that Pennsylvania and/or Georgia law applies, HOA Systems is not required to give Hoot Owl an opportunity to cure its defaults, and all of Hoot Owl's rights under the Franchise Agreement with respect to its Hooters franchised restaurants located in Pennsylvania have already terminated.

94.

Under the New Jersey Franchise Protection Act, a franchisor must give a franchisee written notice of termination "at least 60 days in advance of such termination…except (1) where the alleged grounds are voluntary abandonment by the franchisee of the franchise relationship in which event the aforementioned written notice may be given 15 days in advance of such termination…." *See* N.J.S.A. § 56:10-5.

95.

Therefore, to the extent that New Jersey law applies, HOA Systems is not required to give Hoot Owl an opportunity to cure its defaults, and HOA Systems is entitled to terminate all of Hoot Owl's rights under the Franchise Agreement with respect to its Hooters franchised restaurants located in New Jersey following the statutory notice period.

96.

Until this legal issue is resolved, HOA Systems is uncertain as to its termination rights under the Franchise Agreement and cannot proceed without the risk of violating one or more of the state laws described above.

97.

A declaratory judgment is necessary to eliminate this uncertainty and to guide future actions by HOA Systems in enforcing its rights under the Franchise Agreement.

98.

Accordingly, HOA Systems seeks a declaratory judgment (1) that Georgia law governs this matter, pursuant to the choice of law provision in the Franchise Agreement; (2) that under Georgia law, HOA Systems is not required to give Hoot Owl an opportunity to cure its defaults under Section XIII, Paragraphs A.16 and

A.17 of the Franchise Agreement, and (3) that under Georgia law, Hoot Owl's rights under the Franchise Agreement terminated immediately and automatically upon the defaults set forth above.

99.

Alternatively, should the Court determine that Georgia law does not govern this matter in its entirety, HOA Systems seeks a declaration:

(i)     that HOA Systems is not required to give Hoot Owl an opportunity to cure its defaults under Section XIII, Paragraphs A.16 and A.17 of the Franchise Agreement, regardless of which state's laws apply;

(ii)    whether and in what way(s) the franchise relationship statutes in Delaware, Rhode Island, and New Jersey apply to the termination of Hoot Owl's rights under the franchise agreement with respect to its Hooters franchised restaurants in each of those states, respectively;

(iii)   whether Georgia law governs the termination of Hoot Owl's rights under the Franchise Agreement with respect to its Hooters franchised restaurants in Pennsylvania, which does not have a franchise relationship statute, and/or in any other states;

(iv)    that Hoot Owl's willful and material breaches of the Franchise Agreement, as set forth above, constitute good cause for termination pursuant to any applicable state franchise relationship statute;

(v)    that, at a minimum, HOA Systems is entitled to terminate Hoot Owl's rights under the Franchise Agreement with respect to its Hooters franchised restaurants in Delaware and New Jersey after the applicable statutory notice periods and in Rhode Island immediately, and that Hoot Owl's rights with respect to its Pennsylvania restaurants have already been properly terminated.

### Count II
### Breach of Contract by Hoot Owl

100.

The allegations of the preceding paragraphs are repeated and incorporated herein as if set out in full.

101.

Hoot Owl has willfully breached the Franchise Agreement by ceasing to operate and abandoning the Rehoboth Restaurant.

102.

Hoot Owl has willfully breached the Franchise Agreement by failing to complete repairs or reconstruction of the Warwick Restaurant within 180 days of the damage caused by the storm in the winter of 2015.

103.

Hoot Owl has willfully breached the Franchise Agreement by ceasing to operate and abandoning the Warwick Restaurant.

104.

At a minimum, under Georgia law, Hoot Owl's franchise rights with respect to its Hooters franchised restaurants in Pennsylvania have terminated.

105.

Hoot Owl has breached the Franchise Agreement by continuing to operate its Hooters franchised restaurants in Pennsylvania following termination.

106.

Hoot Owl has breached the Franchise Agreement by continuing to use the Hooters System and the Hooters Marks following termination of its franchise rights with regard to its Hooters franchised restaurants in Pennsylvania.

107.

Hoot Owl has breached the Franchise Agreement by failing to pay HOA Systems the post-termination liquidated damages owed pursuant to the Franchise Agreement with regard to its Pennsylvania restaurants.

108.

As a direct and proximate result of Hoot Owl's breaches of the Franchise Agreement, HOA Systems has suffered damages.

109.

Accordingly, judgment should be entered in favor of HOA Systems and against Hoot Owl for damages, including but not limited to liquidated damages, the specific amount of which shall be proven at trial.

**Count III**
**Lanham Act – Trademark Infringement**

110.

The allegations of the proceeding paragraphs are repeated and incorporated herein as if set out in full.

111.

At a minimum, under Georgia law, Hoot Owl's franchise rights with respect to its Hooters franchised restaurants in Pennsylvania have terminated.

112.

As a result, Hoot Owl's acts, practices, and conduct constitute an infringing use in interstate commerce of a reproduction, counterfeit, copy, or colorable imitation of the Hooters Marks, and Hoot Owl's sale, offering for sale, distribution, or advertising of goods and services under the Hooters Marks, or any designs similar thereto, is likely to cause confusion or mistake or to deceive the public in violation of 15 U.S.C. § 1114(l).

113.

As a direct and proximate result of Hoot Owl's infringement, Plaintiffs have been and are likely to be substantially injured in its business, including their goodwill and reputation, resulting in lost revenues and profits and diminished goodwill.

114.

Hoot Owl's actions demonstrate an intentional, willful, and bad faith intent to trade on the goodwill associated with the Hooters Marks.

115.

Plaintiffs have suffered injury and are entitled to recover all damages incurred as a direct and proximate result of Hoot Owl's actions, all profits realized, and the costs of this suit, pursuant to 15 U.S.C. § 1117.

116.

Hoot Owl's actions were willful, deliberate, and fraudulent, and accordingly, Plaintiffs are entitled to treble damages and an award of reasonable attorneys' fees against Hoot Owl pursuant to 15 U.S.C. § 1117.

117.

Plaintiffs have no adequate remedy at law because the Hooters Marks are unique and represent to the public Plaintiffs' identity, reputation, and goodwill, such that damages alone cannot fully compensate Plaintiffs for Hoot Owl's misconduct.

118.

Unless enjoined by the Court, Hoot Owl will continue to use and infringe the Hooters Marks in Pennsylvania, to Plaintiffs' irreparable injury. This threat of future injury to Plaintiffs' business identity, goodwill, and reputation requires injunctive relief to prevent Hoot Owl's continued use of the Hooters Marks and to ameliorate and mitigate Plaintiffs' injury.

## Count IV
## Lanham Act – Unfair Competition

119.

The allegations of the proceeding paragraphs are repeated and incorporated herein as if set out in full.

120.

At a minimum, under Georgia law, Hoot Owl's franchise rights with respect to its Hooters franchised restaurants in Pennsylvania have terminated.

121.

As a result, Hoot Owl's acts, practices, and conduct constitute unfair competition, false designation of origin, and false or misleading descriptions or representations of fact, in that they are likely to cause confusion or to cause mistake, to deceive others as to the affiliation, connection, or association of the parties, and/or to misrepresent the nature, characteristics, qualities, or geographic origin of the parties' goods, services, and commercial activities, all in violation of 15 U.S.C. § 1125(a).

122.

As a direct and proximate result of Hoot Owl's unfair competition, Plaintiffs have been and are likely to be substantially injured in their business, including their goodwill and reputation, resulting in lost revenues and profits and diminished goodwill.

123.

Plaintiffs have no adequate remedy at law because the Hooters Marks are unique and represent to the public Plaintiffs' identity, reputation, and goodwill,

such that damages alone cannot fully compensate Plaintiffs for Hoot Owl's misconduct.

124.

Unless enjoined by the Court, Hoot Owl will continue to compete unfairly with Plaintiffs in Pennsylvania, to Plaintiffs' irreparable injury. This threat of future injury to Plaintiffs' business identify, goodwill, and reputation requires injunctive relief to prevent Hoot Owl's continued unfair competition and to ameliorate and mitigate Plaintiffs' injury.

## Count V
## Injunctive Relief – Post-Termination Obligations

125.

The allegations of the proceeding paragraphs are repeated and incorporated herein as if set out in full.

126.

At a minimum, under Georgia law, Hoot Owl's franchise rights with respect to its Hooters franchised restaurants in Pennsylvania have terminated.

127.

Hoot Owl has failed and refused to perform its post-termination obligations under the Franchise Agreement, including its obligations (i) to cease using the Hooters System and the Hooters Marks in Pennsylvania; (ii) to de-identify its

terminated franchised Hooters restaurants in Pennsylvania; and (iii) to discontinue all use of any confidential and proprietary information of HOA Systems in Pennsylvania.

### 128.

Unless ordered by the Court to perform its post-termination obligations under the Franchise Agreement, Hoot Owl will continue to breach its post-termination obligations.

### 129.

Unless Hoot Owl is ordered to perform its post-termination obligations under the Franchise Agreement, HOA Systems is likely to be substantially injured in its business, including its goodwill and reputation, resulting in lost revenues and profits and diminished goodwill, for which HOA Systems has not adequate remedy at law.

### 130.

This threat of future injury to the business identity, goodwill, and reputation of HOA Systems requires that Hoot Owl be ordered to perform its post-termination obligations under the Franchise Agreeent to prevent its continued breach and to ameliorate and mitigate the injury suffered by HOA Systems.

## Count VI
## Attorneys' Fees and Litigation Expenses

### 131.

The allegations of the proceeding paragraphs are repeated and incorporated herein as if set out in full.

### 132.

Hoot Owl's willful acts of trademark infringement, as set forth above, render this an exceptional case under 15 U.S.C. § 1117(a), such that Plaintiffs are entitled to recover an award of reasonable attorneys' fees and taxable costs.

### 133.

Defendant is liable to Plaintiffs for their attorneys' fees and costs of collection, pursuant to O.C.G.A. § 13-6-11, because Defendant has acted in bad faith, has been stubbornly litigious, and has caused Plaintiffs unnecessary trouble and expense.

### 134.

Defendant is also liable to Plaintiffs by contractual agreement for Plaintiffs' attorneys' fees and costs.

**Prayer for Relief**

WHEREFORE, Plaintiffs pray and demand as follows:

a)    That the Court enter a declaratory judgment as set forth in Count I of this Complaint;

b)    That the Court enter judgment in favor of Plaintiffs and against Defendant for monetary damages in an amount to be proven at trial;

c)    That the Court enter an injunction requiring Hoot Owl to comply with its post-termination obligations under the Franchise Agreement with respect to its former Hooters franchised restaurants in Pennsylvania;

d)    That the Court enter an injunction preventing Hoot Owl from continuing to use and infringe the Hooters Marks and from unfairly competing with Plaintiffs in Pennsylvania;

e)    That the Court award Plaintiffs all attorneys' fees and costs incurred by Plaintiffs in this action;

f)    That the Court award Plaintiffs pre-judgment and post-judgment interest as provided by law;

g)    That the Court award Plaintiffs such other and further relief as it deems appropriate.

[SIGNATURE FOLLOWS ON NEXT PAGE]

Respectfully submitted, this 6th day of June, 2016,

**PARKER, HUDSON, RAINER & DOBBS LLP**

*/s/ Ronald T. Coleman, Jr.*
Ronald T. Coleman, Jr.
Georgia Bar No. 177655
Zachary M. LeVasseur
Georgia Bar No. 861514
303 Peachtree Street, NE
Suite 3600
Atlanta, Georgia 30308
rcoleman@phrd.com
zlevasseur@phrd.com
Telephone:  (404) 523-5300
Facsimile:  (404) 522-8409

*Attorneys for Plaintiffs*

45