# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**HOOTERS OF AMERICA, LLC**, a
Georgia limited liability company,
**HOA SYSTEMS, LLC.**, a Delaware
limited liability company, and
**HI LIMITED PARTNERSHIP**, a
Florida limited partnership,

     Plaintiffs,

vs.

**HOOT OWL RESTAURANTS,
LLC**, a Delaware limited liability
company, **PHILLIP MORAN,
WILLIAM HYSINGER**, and
**GARY GIVENS**,

     Defendants.

Civil Case No.: 1:16-cv-01825-SCJ

**JURY TRIAL DEMANDED**

## ANSWER AND COUNTERCLAIM OF HOOT OWL RESTAURANTS, LLC

Hoot Owl Restaurants, LLC ("Hoot Owl") files this Answer and Counterclaim

to the Second Amended Complaint filed by Plaintiffs Hooters of America, LLC,

HOA Systems, LLC, and HI Limited Partnership (collectively, "Plaintiffs"), and

respectfully shows this Court as follows:

## FIRST DEFENSE

Plaintiffs' claims are barred, in whole or in part, by accord and satisfaction.

## SECOND DEFENSE

Plaintiffs' claims are barred, in whole or in part, by duress.

## THIRD DEFENSE

Plaintiffs' claims are barred, in whole or in part, by estoppel.

## FOURTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by failure of consideration.

## FIFTH DEFENSE

Plaintiffs' claims are barred, in whole or part, by illegality.

## SIXTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by laches.

## SEVENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by license.

## EIGHTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by payment.

## NINTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by release.

## TENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by *res judicata*.

## ELEVENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by waiver.

## <u>SPECIFIC RESPONSES</u>

In response to the numbered allegations in Plaintiffs' Second Amended Complaint, Hoot Owl responds as follows:

1.

Hoot Owl admits the allegations contained in paragraph 1 of the Second Amended Complaint.

2.

Hoot Owl admits the allegations contained in paragraph 2 of the Second Amended Complaint.

3.

Hoot Owl admits the allegations contained in paragraph 3 of the Second Amended Complaint.

4.

Hoot Owl admits the allegations contained in paragraph 4 of the Second Amended Complaint.

5.

Hoot Owl admits the allegations contained in paragraph 5 of the Second Amended Complaint.

6.

Hoot Owl admits the allegations contained in paragraph 6 of the Second

Amended Complaint.

7.

Hoot Owl admits the allegations contained in paragraph 7 of the Second Amended Complaint.

8.

Hoot Owl admits the allegations contained in paragraph 8 of the Second Amended Complaint. Plaintiff contends that the case arises under the Lanham Act, the Declaratory Judgment Act and under common law, but Hoot Owl denies that Hoot Owl has violated those Acts.

9.

Hoot Owl admits that Plaintiffs contend this Court has original subject matter jurisdiction, but Hoot Owl denies that there is any claim and that the prior pending litigation in New Jersey is the appropriate forum for resolution of these issues.

10.

Hoot Owl admits that the Court has personal jurisdiction over Defendants, but denies that the case should be pending in the State of Georgia and should be pending in State of New Jersey under the New Jersey Franchise Practices Act.

11.

Hoot Owl denies that Plaintiffs have set forth sufficient factual allegations to support Georgia Long Arm statute jurisdiction.

12.

In response to the allegations contained in Paragraph 12 of the Second Amended Complaint, Hoot Owl admits that the Franchise Agreement sets forth venue in this Court, but Hoot Owl denies that venue is proper in this Court.

13.

Hoot Owl denies that venue is proper in this Court because the New Jersey Franchise Practices Act requires claims involving that Act to be heard in New Jersey.

14.

Hoot Owl denies the allegations contained in paragraph 14 of Plaintiffs' Second Amended Complaint.

15.

Hoot Owl admits the allegations contained paragraph 15 of Plaintiffs' Second Amended Complaint.

16.

Hoot Owl is without sufficient information to form a belief as to truth of the allegations contained in paragraph 16 of Plaintiffs' Second Amended Complaint; therefore, the same stand as denied.

17.

Hoot Owl admits the allegations contained in paragraph 17 of the Second Amended Complaint.

18.

Hoot Owl admits the allegations contained in paragraph 18 of the Second Amended Complaint.

19.

Hoot Owl admits the allegations contained paragraph 19 of the Second Amended Complaint.

20.

Hoot Owl admits the allegations contained paragraph 20 the Second Amended Complaint.

21.

Hoot Owl admits the allegations contained in paragraph 21 of the Second Amended Complaint.

22.

Hoot Owl admits the allegations contained in paragraph 22 of the Second Amended Complaint.

23.

Hoot Owl admits the allegations contained in paragraph 23 of the Second Amended Complaint.

24.

Hoot Owl admits the allegations contained in paragraph 24 of the Second

Amended Complaint.

25.

Hoot Owl admits the allegations contained paragraph 25 of the Second Amended Complaint.

26.

Hoot Owl admits the allegations contained in paragraph 26 of the Second Amended Complaint.

27.

Hoot Owl denies the allegations as stated in paragraph 27 of the Second Amended Complaint, but Hoot Owl admits that its affiliated entities own and operate individually franchised restaurants in those states, all of which are separately subject to the Franchise Agreement.

28.

Hoot Owl denies the allegations as stated in paragraph 28 of the Second Amended Complaint, but Hoot Owl admits that its affiliated entities operated twelve individually franchised restaurants, in those states.

29.

Hoot Owl admits the allegations contained in paragraph 29 of the Second Amended Complaint.

30.

Hoot Owl admits the allegations contained in paragraph 30 of the Second Amended Complaint.

31.

In response to the allegations contained in paragraph 31 of the Second Amended Complaint, Hoot Owl admits that the language quoted from the franchise agreement is correctly quoted.

32.

In response to the allegations contained in paragraph 32 of the Second Amended Complaint, Hoot Owl admits that the franchise agreement requires Hoot Owl to take steps to repair the premises, but Hoot Owl points out that the franchise agreement requires Hoot Owl to maintain casualty insurance to cover such damages and Hoot Owl is in litigation with its insurance carrier to recover the insurance proceeds. Hoot Owl has informed Plaintiffs of the status of the claims process.

33.

In response to the allegations contained in paragraph 33 of the Second Amended Complaint, Hoot Owl admits that the language is correctly quoted from the Franchise Agreement.

34.

In response to the allegations contained in paragraph 34 of the Second Amended Complaint, Hoot Owl admits that the language is correctly quoted from

the Franchise Agreement.

35.

In response to the allegations contained in paragraph 35 of the Second Amended Complaint, Hoot Owl admits that the language is correctly quoted from the Franchise Agreement.

36.

In response to the allegations contained in paragraph 36 of the Second Amended Complaint, Hoot Owl admits that the language is correctly quoted from the Franchise Agreement, but Hoot Owl notes that the Franchise Agreement also requires "Hooter of America, in exercise of such rights, shall utilize all reasonable efforts to prevent disruption or interference with the business of Franchisee," which HOA and EcoSure failed to do.

37.

In response to the allegations contained in paragraph 37 of the Second Amended Complaint, Hoot Owl admits that the Franchise Agreement contains an "Entire Agreement" clause, and by way of further response, states that the parties mutually departed from that provision.

38.

In response to the allegations contained in paragraph 38 of the Second Amended Complaint, Hoot Owl admits that the language is correctly quoted from

the Franchise Agreement; however, the quoted language should include "[e]xcept as otherwise provided in this Franchise Agreement."

39.

In response to the allegations contained in paragraph 39 of the Second Amended Complaint, Hoot Owl admits that the language is correctly quoted from the Franchise Agreement.

40.

Hoot Owl denies the allegations as stated in paragraph 40 of the Second Amended Complaint, because the Franchise Agreement only addresses what that individual "Franchised Business" is required to do.

41.

In response to the allegations contained in paragraph 41 of the Second Amended Complaint, Hoot Owl admits that the Franchise Agreement provides for such damages, but Hoot Owl asserts the request for the liquidated damages means that Plaintiffs cannot recover in excess of the liquidated damages amount.

42.

Hoot Owl denies that it operated the franchise restaurant located 70 Rehoboth Avenue, #27, Rehoboth Beach, Delaware 19971, but Hoot Owl states that it was operated by Rehoboth Wings, LLC.

43.

Hoot Owl denies the allegations as stated in paragraph 43 of the Second Amended Complaint, but Hoot Owl admits that Rehoboth Wings, LLC operated the restaurant on a seasonal basis with the permission of HOA Systems, which was a deviation from the Franchise Agreement.

44.

In response to the allegations contained in paragraph 44 of the Second Amended Complaint, Hoot Owl admits the Rehoboth Restaurant opened each year in or around Period 5 of the Hoot Owl Reporting Period and closed for the season in or around Period 10 of the Hoot Owl fiscal year.

45.

Hoot Owl denies the allegations contained in paragraph 45 of the Second Amended Complaint, but Hoot Owl states that Rehoboth Wings, LLC opened in time for the summer season.

46.

Hoot Owl denies the allegations as stated in paragraph 46 of the Second Amended Complaint, Hoot Owl admits that Rehoboth Wings, LLC did not open the Rehoboth Beach restaurant in the 2016 season because of a change in location that was sought by Hoot Owl and the subsequent loss of that potential lease.

47.

In response to the allegations contained in paragraph 47 of the Second

Amended Complaint, Hoot Owl admits that on May 15, 2016, Jim Marr wrote an email to Phillip Moran, the CEO of Hoot Owl, to inquire as to whether Hoot Owl would reopen the Rehoboth Beach Restaurant in the 2016 season.

48.

In response to the allegations contained in paragraph 48 of the Second Amended Complaint, Hoot Owl admits that Mr. Moran did not reply to Mr. Marr's May 15, 2016 email until 10 days later on May 25, 2016 when Mr. Moran confirmed that Rehoboth Wings, LLC would not be re-opening the Rehoboth Restaurant for the 2016 season and would be relocating. Mr. Moran had already had previous communications with HOA as to the negotiations with a landlord for a new location for the 2016 season and how those negotiations failed at the last moment.

49.

Hoot Owl denies the allegations as stated in paragraph 49 of the Second Amended Complaint, but Hoot Owl states that Rehoboth Wings, LLC no longer occupies that space.

50.

Hoot Owl admits the allegations contained in paragraph 50 of the Second Amended Complaint.

51.

In response to the allegations contained in paragraph 51 of the Second

Amended Complaint, Hoot Owl's Rehoboth Facebook page does not indicate that the restaurant is permanently closed.

## 52.

Hoot Owl admits the allegations contained in paragraph 52 of the Second Amended Complaint.

## 53.

In response to the allegations contained in paragraph 53 of the Second Amended Complaint, Hoot Owl admits that the prior Rehoboth Beach location is available because Rehoboth Wings, LLC is trying to re-locate its restaurant to a new location, which has been approved by HOA, but HOA is unjustifiably requiring that Rehoboth Wings, LLC sign a new Franchise Agreement, which terms are substantially different from the existing Franchise Agreement.

## 54.

Hoot Owl denies the allegation stated in paragraph 54 of the Second Amended Complaint.

## 55.

Hoot Owl admits the allegations contained in paragraph 55 of the Second Amended Complaint.

## 56.

Hoot Owl denies the allegations contained in paragraph 56 of the Second

Amended Complaint.

## 57.

Hoot Owl denies the allegations as stated in paragraph 57 of the Second Amended Complaint, Hoot Owl states that Warwick Wings, LLC operated the Warwick Restaurant.

## 58.

Hoot Owl denies the allegation contained in paragraph 58 of the Second Amended Complaint.

## 59.

Hoot Owl is without sufficient information to form a belief as to the truth of the allegations contained in paragraph 59 of the Second Amended Complaint; therefore, the same stand as denied.

## 60.

Hoot Owl denies the allegations contained in paragraph 60 of the Second Amended Complaint.

## 61.

In response to the allegations contained in paragraph 61 of the Second Amended Complaint, Hoot Owl states that Warwick Wings closed the Warwick restaurant temporarily to make necessary repairs and maintenance.

## 62.

In response to the allegations contained in paragraph 62 of the Second Amended Complaint, Hoot Owl admits it sent an email regarding the remodeling process for the Warwick Restaurant as required by the Franchise Agreement.

63.

In response to the allegations contained in paragraph 63 of the Second Amended Complaint, Hoot Owl denies the allegations.

64.

Hoot Owl denies the allegations contained in paragraph 64 of the Second Amended Complaint, but Hoot Owl admits the storm in the Winter of 2015 caused damage to the building, including the roof.

65.

Hoot Owl denies the allegations contained in paragraph 65 of the Second Amended Complaint, and Hoot Owl states that Warwick Wings, LLC is actively involved in seeking to resolve the casualty liability insurance coverage claim to allow the repair of the building which cannot be repaired and occupied without the approval of the Warwick City building inspector, and HOA has been receiving the required royalties and national advertising fees pursuant to the Franchise Agreement.

66.

In response to the allegations contained in paragraph 66 of the Second Amended Complaint, Hoot Owl lacks sufficient information to form a belief as to

the truth of the allegations; therefore, the same stand as denied.

67.

Hoot Owl admits the allegations contained in paragraph 67 of the Second Amended Complaint.

68.

In response to the allegations contained in paragraph 68 of the Second Amended Complaint, Hoot Owl admits that more than 180 days have passed since the storm in the winter of 2015, but Hoot Owl states that Warwick Wings, LLC is trying to repair the Warwick Restaurant.

69.

Hoot Owl denies the allegation contained in paragraph 69 of the Second Amended Complaint.

70.

Hoot Owl is without sufficient information to form a belief as to the truth of the allegations contained paragraph 70 of the Second Amended Complaint, therefore, the same stand as denied.

71.

Hoot Owl denies the allegations contained in paragraph 71 of the Second Amended Complaint.

72.

In response to the allegations contained in paragraph 72 of the Second Amended Complaint, Hoot Owl admits it received a copy of the letter attached to the Second Amended Complaint as Exhibit B, but Hoot Owl denies it is a valid termination.

73.

In response to the allegations contained in paragraph 73 of the Second Amended Complaint, Hoot Owl admits that the document alleges that Hoot Owl breached the franchise agreement by abandoning the Rehoboth Restaurant willfully and by failing to complete repairs or reconstruction of the Warwick Restaurant, and by abandoning the Warwick Restaurant; however, Hoot Owl denies it, or its respective affiliates abandoned either the Rehoboth Restaurant or the Warwick Restaurant, and Hoot Owl denies that it, or its respective affiliates, breached any of the franchise obligations.

74.

In response to the allegations contained in paragraph 74 the Second Amended Complaint, the letter purports to put Hoot Owl on termination notice and alleges that Hoot Owl's alleged defaults constituted good cause for termination of the franchise agreement and all rights thereunder, but Hoot Owl denies that the letter referenced "good cause."

75.

In response to the allegations contained paragraph 75 of the Second Amended Complaint, Hoot Owl admits that Plaintiffs' purported termination notice alleged that under Georgia law all of Hoot Owl's franchise rights under the franchise agreement related to the franchise restaurants of its affiliates in Pennsylvania were immediately terminated, but Hoot Owl denies that said termination notice was valid and Hoot Owl notes that HOA continues to collect royalty fees from those franchised restaurants.

76.

In response to the allegations contained in paragraph 76 of the Second Amended Complaint, Hoot Owl cannot opine as to what the allegation of "out of an abundance of caution" Plaintiffs are alleging, but the letter does provide that HOA Systems would forbear from acting to terminate the franchise agreement. In fact, the court in New Jersey has noted that the New Jersey law applies to the restaurants in New Jersey.

77.

In response to the allegations contained in paragraph 77 of the Second Amended Complaint, Hoot Owl admits that the letter demanded Hoot Owl comply with post-termination covenants, but Hoot Owl denies that there was any valid termination and HOA continues to receive the required royalty payments and national advertising fees pursuant to the Franchise Agreement.

78.

Hoot Owl denies the allegations as stated in paragraph 78 of the Second Amended Complaint, Hoot Owl states that P. R. Wings, LLC operated the Paramus Restaurant.

79.

Hoot Owl denies the allegations contained in paragraph 79 of the Second Amended Complaint.

80.

In response to the allegations contained in paragraph 80 of the Second Amended Complaint, Hoot Owl admits that EcoSure, which is hired by HOA and is not "independent," visited the Paramus location, but Hoot Owl denies the visit was in the ordinary course of business.

81.

In response to the allegations contained in paragraph 81 of the Second Amended Complaint, Hoot Owl admits that EcoSure claimed to find violations, but Hoot Owl states that the restaurant passed the local health department inspection just several weeks prior to the EcoSure visit, and, by way of further response, Hoot Owl states that EcoSure visit occurred right after P.R. Wings, LLC determined that an emergency issue had arisen and while P.R. Wings, LLC was taking steps to address the issues.

82.

In response to the allegations contained in paragraph 82 of the Second Amended Complaint, Hoot Owl admits that a sign was placed, but Hoot Owl is without sufficient information to form a belief as to whether Mr. Marr went to the store as alleged; therefore, the same stand as denied.

83.

In response to the allegations contained in paragraph 83 of the Second Amended Complaint, Hoot Owl admits that Hoot Owl notified Mr. Marr that it was not safe for him to enter the store while the repair work was ongoing and he would not be allowed entrance.  By way of further response, it had notified Mr. Marr earlier in the day that the Paramus location was closed for emergency repairs and access was strictly limited for safety reasons, so he was told that he would be able to visit the store once the repair efforts were complete.

84.

Hoot Owl denies the allegation as stated in paragraph 84 of the Second Amended Complaint, but Hoot Owl admits P. R. Wings, LLC has not re-opened the Paramus location because of issues relating to the lease and because HOA has unjustifiably denied what should be a permitted relocation of the restaurant.

85.

Hoot Owl denies the allegation contained in paragraph 85 of the Second

Amended Complaint.

86.

Hoot Owl denies allegations contained in paragraph 86 of the Second Amended Complaint.

87.

In response to the allegations contained in paragraph 87of the Second Amended Complaint, Hoot Owl admits it received a copy of the document referred to as attached as exhibit C to the Second Amended Complaint.

88.

In response to the allegations contained in paragraph 88 of the Second Amended Complaint, Hoot Owl admits that the document sets forth what HOA alleges are breaches of the franchise agreement, but Hoot Owl denies that it breached the franchise agreement.

89.

In response to the allegations contained in paragraph 89 of the Second Amended Complaint, Hoot Owl denies that the phrase "good cause for termination" appears in the Franchise Agreement and Hoot Owl denies that it committed any breach.

90.

Hoot Owl denies the allegations contained paragraph 90 of the Second

Amended Complaint.

## COUNT I

91.

Hoot Owl re-alleges its defenses and responses to paragraphs 1 through 24 and 25 through 90 above as if fully set forth herein.

92.

Hoot Owl denies the allegations contained paragraph 92 of the Second Amended Complaint because the law for these franchise issues requires litigation in another jurisdiction.

93.

In response to the allegations contained in paragraph 93 of the Second Amended Complaint, Hoot Owl admits the franchise agreement provides the quoted language; however, the venue choice in the franchise agreement does not supersede the laws of the States of New Jersey, Delaware, and Rhode Island.

94.

In response to the allegations contained in paragraph 94 of the Second Amended Complaint, Hoot Owl admits that the franchise agreement claims that the rights shall automatically terminate without notice; however, as set forth above, there is no valid termination.

95.

Hoot Owl denies the allegations contained in paragraph 95 of the Second Amended Complaint, Hoot Owl is not sure to what "Georgia law" Plaintiffs are referring, but Hoot Owl notes that Georgia will respect another state's laws, such as the New Jersey Franchise Practices Act.

96.

Hoot Owl denies the allegations contained in paragraph 96 of the Second Amended Complaint.

97.

Hoot Owl admits the allegations contained in Paragraph 97 of the Second Amended Complaint.

98.

In response to the allegations contained in paragraph 98 of the Second Amended Complaint, Hoot Owl cannot admit or deny what HOA Systems "believes," but Hoot Owl states that the franchise choice of forum laws of the states of New Jersey, Rhode Island, and Delaware override the choice of law provision of the franchise agreement.

99.

In response to the allegations contained in paragraph 99 of the Second Amended Complaint, Hoot Owl admits it disagrees with Plaintiffs' contentions.

100.

In response to the allegations contained in paragraph 100 of the Second Amended Complaint, Hoot Owl admits that Hoot Owl disputes whether HOA is entitled to terminate any of the Hoot Owl franchise restaurants on basis of alleged default set forth in termination notice.

101.

Hoot Owl denies the allegations contained in paragraph 101 of the Second Amended Complaint.

102.

Hoot Owl denies that HOA is entitled to the relief sought.

103.

Hoot Owl denies the allegations contained in paragraph 103 of the Second Amended Complaint.

**COUNT II**

104.

Hoot Owl re-alleges its defenses and responses above to paragraphs 1 through 2, 4, and 25 through 90 is if fully set forth herein.

105.

Hoot Owl denies the allegations contained in paragraph 105 of the Second Amended Complaint.

106.

Hoot Owl denies the allegations contained in paragraph 106 of the Second Amended Complaint.

107.

Hoot Owl denies the allegations contained in paragraph 107 of the Second Amended Complaint.

108.

Hoot Owl denies the allegations contained in paragraph 108 of the Second Amended Complaint.

109.

Hoot Owl denies the allegations contained in paragraph 109 of the Second Amended Complaint.

110.

Hoot Owl denies allegations contained in paragraph 110 of the Second Amended Complaint.

111.

Hoot Owl denies the allegations contained in paragraph 111 of the Second Amended Complaint.

112.

Hoot Owl denies allegations contained in paragraph 112 of the Second Amended Complaint.

113.

Hoot Owl denies the allegations contained paragraph 113of the Second Amended Complaint.

114.

Hoot Owl denies the allegations contained paragraph 114 of the Second Amended Complaint.

115.

Hoot Owl denies the allegations contained in paragraph 115 of the Second Amended Complaint.

116.

Hoot Owl denies the allegations contained paragraph 116 of the Second Amended Complaint.

117.

Hoot Owl denies the allegations contained in paragraph 117 of the Second Amended Complaint.

118.

Hoot Owl denies the allegations contained paragraph 118 of the Second Amended Complaint.

119.

Hoot Owl denies the allegations contained in paragraph 119 of the Second Amended Complaint.

## COUNT III

### 120.

Hoot Owl re-alleges its defenses and responses to paragraphs 2 through 4, 15 through 30, 72 through 77, and 90 as if fully set forth herein.

### 121.

In response to the allegations contained in paragraph 121 of the Second Amended Complaint, Hoot Owl admits that it had the right to use the licensed marks in accordance with the Franchise Agreement, but to the extent HOA permitted additional use, then Hoot Owl was permitted to use the marks as permitted by HOA.

### 122.

Hoot Owl denies the allegations contained paragraph 122 of the Second Amended Complaint.

### 123.

In response to the allegations contained in paragraph 123 of the Second Amended Complaint, Hoot Owl admits that uses Hooters Marks and Hooters System in connection with the operation of its affiliated restaurants in Pennsylvania but Hoot Owl denies that those restaurants were properly terminated.

### 124.

Hoot Owl denies the allegations contained in paragraph 124 of the Second Amended Complaint.

125.

Hoot Owl denies the allegations contained paragraph 125 of the Second Amended Complaint.

126.

Hoot Owl denies the allegations contained in paragraph 126 of the Second Amended Complaint.

127.

Hoot Owl denies the allegations contained in paragraph 127of the Second Amended Complaint.

128.

Hoot Owl denies the allegations contained in paragraph 128 of the Second Amended Complaint.

129.

Hoot Owl denies allegations contained in paragraph 129 of the Second Amended Complaint.

130.

Hoot Owl denies the allegations contained in paragraph 130 of the Second Amended Complaint.

131.

Hoot Owl denies the allegations contained in paragraph 131 of the Second Amended Complaint.

132.

Hoot Owl denies the allegations contained in paragraph 132 of the Second Amended Complaint.

133.

Hoot Owl denies the allegations contained in paragraph 133 of the Second Amended Complaint.

**COUNT IV**

134.

Hoot Owl re-alleges its defenses and responses to paragraphs 2 through 4, 15 through 30, 72 through 77, and 90 above as if fully set forth herein.

135.

Hoot Owl denies the allegations contained in paragraph 135 of the Second Amended Complaint.

136.

Hoot Owl denies the allegations contained in paragraph 136 of the Second Amended Complaint.

137.

Hoot Owl denies the allegations contained in paragraph 137 of the Second Amended Complaint.

138.

Hoot Owl denies the allegations contained in paragraph 138 of the Second Amended Complaint.

139.

Hoot Owl denies the allegations contained in paragraph 139 of the Second Amended Complaint.

140.

Hoot Owl denies the allegations contained in paragraph 140 of the Second Amended Complaint.

141.

Hoot Owl denies the allegations contained in paragraph 141 of the Second Amended Complaint.

## COUNT V

142.

Hoot Owl re-alleges its defenses and responses to paragraphs 1 through 2, 4, 25 through 30, 39 through 40, 72 through 77, and 90 above as if fully set forth herein.

143.

Hoot Owl denies the allegations contained in paragraph 143 of the Second Amended Complaint.

144.

Hoot Owl denies the allegations contained in paragraph 144 of the Second Amended Complaint.

145.

Hoot Owl denies the allegations contained in paragraph 145 of the Second Amended Complaint.

146.

Hoot Owl denies the allegations contained in paragraph 146 of the Second Amended Complaint.

147.

Hoot Owl denies the allegations contained in paragraph 147 of the Second Amended Complaint.

## COUNT VI

148.

Hoot Owl re-alleges its defenses and responses to paragraphs 1 through 2,  4 through 7, 25 through 41, and 87 through 90 above as if fully set forth herein.

149.

In response to the allegations contained in paragraph 149 of the Second Amended Complaint, Hoot Owl denies the allegations as stated, but Hoot Owl admits that the Guarantors, as indirect owners of Hoot Owl, LLC, signed the Guaranty.

150.

Hoot Owl admits the allegations contained in paragraph 150 of the Second Amended Complaint.

151.

Hoot Owl admits the allegations contained in paragraph 151 of the Second Amended Complaint.

152.

In response to the allegations contained in paragraph 152 of the Second Amended Complaint, Hoot Owl lacks sufficient information to form a belief as to the truth of the allegations; therefore, the same stand as denied.

153.

In response to the allegations contained in paragraph 153 of the Second Amended Complaint, Hoot Owl denies that HOA Systems is a third party beneficiary of the Guarantor Defendants' obligations under the Guaranty. If HOA Systems is the assignee of the Franchise Agreement, then HOA Systems would be a party, and not a third party beneficiary of the Guaranty.

154.

Hoot Owl admits that Phillip Moran, William Hysinger, and Gary Givens each received a letter, a copy of which is attached as Exhibit C to the Second Amended Complaint and that HOA Systems made the demands set forth in the letter, but Hoot Owl denies that there was any default and any triggering of liability under the Guaranty.

155.

Hoot Owl denies the allegations contained in paragraph 155 of the Second Amended Complaint.

156.

Hoot Owl denies the allegations contained in paragraph 156 of the Second Amended Complaint.

157.

Hoot Owl denies the allegations contained in paragraph 157 of the Second Amended Complaint.

158.

Hoot Owl denies the allegations contained in paragraph 158 of the Second Amended Complaint.

159.

Hoot Owl denies the allegations contained in paragraph 159 of the Second Amended Complaint.

## COUNT VII

160.

Hoot Owl re-alleges its defenses and responses to paragraphs 1 through 7,  25, 42 through 90, and 149 through 154 above as if fully set forth herein.

161.

Hoot Owl denies the allegations contained in paragraph 161 of the Second Amended Complaint.

162.

Hoot Owl denies the allegations contained in paragraph 162 of the Second Amended Complaint.

163.

Hoot Owl admits that Plaintiffs correctly quoted the language from the Franchise Agreement as to post-termination obligations, not post-termination covenants, but Hoot Owl denies that there has been any valid termination of the franchise agreement as to any of the restaurants.

164.

Hoot Owl denies each and every allegation of the Second Amended Complaint not specifically admitted herein.

**WHEREFORE**, Hoot Owl respectfully requests the Court dismiss this case with prejudice, with all costs assessed against Plaintiffs and grant Hoot Owl such other and further relief as the Court deems just and proper.

## COUNTERCLAIM

Counterclaim Plaintiff HOOT OWL RESTAURANTS, LLC ("Hoot Owl" or "Counterclaim Plaintiff"), for its claims against Counterclaim Defendants, HOOTERS OF AMERICA, LLC, HOA SYSTEMS, LLC, and HI LIMITED PARTNERSHIP (Hooters of America, LLC, HOA Systems, LLC, and HI Limited Partnership are collectively referred to as "HOA" or "Counterclaim Defendants"), states as follows:

## INTRODUCTION

1.      This Action is brought for breach by HOA of HOA and Hoot Owl's (collectively, "the Parties") Franchise and Option Agreements (collectively "the Agreements"), violation of the New Jersey Franchise Practices Act ("NJFPA"), the Delaware Security for Franchised Distributors Act, the Rhode Island Fair Dealership Act, breach of contract, tortious interference with contract, breach of the covenant of good faith and fair dealing, unfair competition, the New Jersey Antitrust Act ("NJAA"), injunctive and other equitable relief, civil conspiracy, as well as damages.

## PARTIES

2.      Counterclaim Plaintiff, Hoot Owl, is a Delaware limited liability company, whose affiliates operate franchised restaurants in New Jersey, Rhode Island, Pennsylvania, and Delaware.

3.      Counterclaim Defendant Hooters of America, LLC is a Georgia limited liability company with its principal place of business in Atlanta, Georgia.

4.      Counterclaim Defendant HOA Systems, LLC is a Delaware limited liability company.  Upon information and belief, HOA Systems, LLC is a Hooters of America, LLC subsidiary formed as part of a corporate reorganization, with its principal place of business in Atlanta, Georgia.

5.      Counterclaim Defendant HI Limited Partnership is apparently a Florida limited liability partnership with its principal place of business in Atlanta, Georgia.

6.      The Court has jurisdiction over all of the HOA Defendants because they filed the lawsuit to which this Counterclaim is in response, and all maintain their principal place of business in Atlanta, Georgia and venue is proper in this Court.

## FACTUAL BACKGROUND

7.      The HOA Counterclaim Defendants are a large, national franchisor of Hooters Restaurants ("Hooters") with hundreds of franchise locations throughout the United States and elsewhere in the world, including New Jersey.

8.      Hoot Owl is a small Hooters franchisee with option development rights in New Jersey, Pennsylvania, Rhode Island, and Delaware.

9.    In 2013, HOA precipitously, unilaterally, and without required prior notice, purportedly cancelled Hoot Owl's 2009 and 2011 option and development territory agreements, breaching these agreements and the Franchise Agreement. Nevertheless, as set forth elsewhere herein, HOA proceeded thereafter to act is if it had not unilaterally and unlawfully cancelled the agreements or otherwise materially breached same.

10.    HOA and Hoot Owl executed a Franchise Agreement in 1996 (the "Franchise Agreement" or "FA"), under which Hoot Owl obtained rights to various additional New Jersey, Pennsylvania, and New York locations.  That same day in 1996, the Parties also executed: (1) a Franchise Agreement Addendum, granting Hoot Owl an additional ten (10) years over and beyond the FA's twenty (20) year term; and (2) an Option Addendum, under which Hoot Owl paid $10,000.00 for each, additional and potential restaurant location in its development area, which included Pennsylvania, New York, and Atlantic, Camden, Ocean, Gloucester, and Burlington Counties in New Jersey.

11.    Hoot Owl enjoys certain benefits as HOA's exclusive franchisee in the State of New Jersey (other than the area within a five mile radius of a Hooters restaurant located in Wayne, New Jersey which was granted a franchise before Hoot Owl and HOA entered into the FA), which benefits are not available to other franchisees in the system who do not have exclusive, territorial rights.

12.     Pursuant to the FA, HOA unlawfully required and continues to require Hoot Owl to waive rights it enjoys under the FPA, including but not limited to N.J. Stat. Ann. §56:10-7(a), i.e. by requiring Hoot Owl to release HOA from its various franchise and option agreements.

13.     HOA also violated FPA at N.J. Stat. Ann. §56:10-7(e), by imposing unreasonable standards upon performance upon Hoot Owl, including but not limited to: (1) requiring contribution to an ineffective advertising pool, thereby improperly reducing Hoot Owl's profits; (2) imposing a location closing fee on unproductive restaurants, contrary to its usual course of performance and as a penalty; and (3) imposing prohibitive and inconsistent remodeling and control requirements on existing restaurants both as a reprimand and to dissuade Hoot Owl from exercising its location options so that HOA could sell them to new franchisees and impermissibly increase HOA profits as a result.  These unreasonable standards are currently in effect and are directed particularly at Hoot Owl.

14.     On October 13, 1997, the Parties executed an Amendment to Option Addendum.

15.     On September 6, 1999, the Parties executed an Amended and Restated Option Addendum, optioning additional territories including, but not limited to, the New Jersey counties of Atlantic, Bergen, Burlington, Camden, Gloucester, Hudson, Mercer, Monmouth, and Ocean.  Hoot Owl again paid $10,000.00 to HOA for each

location option, with an additional $65,000.00 to be paid to HOA upon the exercise of any option.

16.    On April 29, 2009, Hoot Owl exercised its right to open a restaurant under the 1999 Agreement for $75,000.00.

17.    On September 24, 2009, in exchange for an additional $30,000.00 paid by Hoot Owl to HOA, the Parties executed another Option Addendum acknowledging that Hoot Owl's prior territory options had expired and, among others, expanding its option territory to include all of New Jersey (the "2009 Agreement").    In addition, Hoot Owl committed to opening five additional restaurants (one per year) commencing on May 1, 2010 (the "Development Schedule").

18.    On April 23, 2010, the Parties executed a Renewal Amendment to the Franchise Agreement granting Hoot Owl an additional 20-year term extension.

19.    In January 2011, Chanticleer Holdings, which had previously been a minority owner of HOA, along with a group of private equity investors including KarpReilly LLC, purchased the remainder of HOA.

20.    At around the same time in January, 2011, Hoot Owl closed two of its franchised locations.    HOA waived the applicable termination fees, despite the requirement in the Parties' FA (as amended) for the imposition of such termination fees.

21.    On May 31, 2011, the Parties executed an Amendment Restating Rights and Extending Dates in Option Addendum (the "2011 Agreement"), which extended the Development Schedule dates and contained an end date of May 1, 2014. The 2011 Agreement also reinstated the rights set forth in the 2009 Agreement.

22.    The FA, the 2009 Agreement, and the 2011 Agreement are all inextricably intertwined and relate back to each other.

23.    On June 1, 2011, Hoot Owl exercised its option to open another restaurant under the 2011 Agreement for $75,000.00.

24.    On August 11, 2011, the Parties agreed to relocate the Hooters restaurant in Bensalem, Pennsylvania.

25.    Following the assumption of ownership by the Chanticleer/KarpReilly group and throughout 2011 and 2012, HOA held two franchisee meetings during which HOA – through its officers and investors – told the franchisees HOA was suspending certain obligations under the various franchise agreements until HOA's new ownership had an opportunity to update the Hooters' concept and growth strategy in order to best compete in the current market, including the development of a new franchise model. Among other things, franchisees were told HOA would not approve any new locations projected to generate less than $3 million in annual sales based upon the new financial model.

26.    Franchisees were further informed that, contrary to the existing franchise agreements, liquidated damages provisions would not be enforced for any locations that ultimately were closed because they were losing money if the franchisee was in good standing and current on its franchise fees.

27.    Hoot Owl believed these representations and relied upon them by deferring its obligations under the Development Schedule (as amended), the 2009 and 2011 Agreements, and the FA.  However, Hoot Owl at all times continued to operate Hooters-branded restaurants as a franchisee in the system.

28.    On July 24, 2013, Hoot Owl received an email from Mark Whittle, introducing himself as HOA's new head of development.  The email further stated a new prospective franchisee was interested in buying Hoot Owl's New Jersey locations if Hoot Owl was willing to sell.

29.    The very next day, on July 25, 2013, and despite HOA's repeated assurances and the parties' long-standing course of dealings – HOA sent Hoot Owl a so-called termination letter (the "Termination Letter") stating that it had lost all rights under the 2009 and 2011 Agreements because of its alleged failure to complete the Development Schedule and that it had forfeited the option and other fees repeatedly paid to HOA.

30.    Despite the Termination Letter, HOA continued its course of dealing with Hoot Owl, suggesting potential sites to Hoot Owl as if the 2009 and 2011

Agreements were still in force.  By way of example, in an email dated October 23, 2013, HOA suggested Hoot Owl explore a Cherry Hill, New Jersey site.

31.    On November 21, 2013, Hoot Owl sent HOA a response to the Termination Letter (the "Moran Letter").  Said letter disputed and denied HOA's position with respect to Hoot Owl's status in the Hooters system due to the prior representations by HOA.

32.    HOA never responded to the Moran Letter and continued to perform as if all of the Agreements were still valid and in force.  Hoot Owl therefore reasonably assumed the Termination Letter was to no effect.  HOA's conduct was, in that regard, in conflict and, in the event HOA's conduct belied its intentions, that conduct was fraudulent.

33.    On December 15, 2013, still conducting business as though the 2009 and 2011 Agreements remained in force and effect, HOA sent an email to Hoot Owl stating Hoot Owl needed to complete a formal request form for "Newark [New Jersey] (and any future sites)" to present to the development committee.

34.    The Newark, New Jersey site was ultimately approved by HOA squarely within the 2009 and 2011 Agreement option territories.  The approval is further indication that HOA's actions were fraudulent.

35.    Likewise, on April 29, 2014, HOA sent Hoot Owl an email suggesting Hoot Owl further investigate a site in Toms River, New Jersey because a liquor

license was available.  Toms River is also located squarely within the development territories outlined in the 2009 and 2011 Agreements.

36.    All of the sites subsequent to the Termination Letter suggested by or approved by HOA fell within the territories set forth in the 2009 and 2011 Agreements, despite the notion that those territories were "forfeited."  HOA's failure to respond to the Moran Letter and HOA's earlier statements, Hoot Owl reasonably believed that it still retained exclusive rights to the territories set forth in the 2009 and 2011 Agreements.

37.    HOA confirmed its earlier statements in July 2014 at a franchise meeting in Las Vegas, by Terry Marks, HOA's CEO.  Hoot Owl thus relied upon the Agreements and statements and reasonably believed the Parties' relationship was ongoing and undisturbed, with Hoot Owl retaining its exclusive development rights as set forth in the Agreements. Marks' statements and HOA's ongoing conduct, to the extent it did not accurately reflect HOA's decision to terminate Hoot Owl's franchise rights, was fraudulent.

38.    In early July, 2014, Hoot Owl inspected and studied a site at a La Quinta hotel in Somerset County (the "Somerset La Quinta Site.")   The location demographics were considered and the financial projection indicated limited sales potential.  Hoot Owl therefore passed on bringing this location to HOA for approval

and continued its search for a site that would meet HOA's new franchise model requirements.

39.    Thereafter, HOA's comments and discussions with Hoot Owl assured Hoot Owl that the Agreements continued and were in full force and effect, and Hoot Owl's rights to its optioned territories were still intact.

40.    HOA has continued its course of conduct, periodically suggesting and approving sites within Hoot Owl's optioned territories under the 2009 and 2011 Agreements.

41.    Despite the foregoing, on July 14, 2015, Hoot Owl received an email from HOA stating that a new development and franchise agreement was executed between HOA and Applegate Enterprises, LLC, and Marie Azir and Joseph Azir, to develop three new restaurants, with two of those restaurants in Hoot Owl's optioned territory.

42.    The HOA Defendants entered into a civil conspiracy with Apple Gate and the Azirs to deprive Hoot Owl of the benefits of its exclusivity rights in New Jersey and thereby caused damages to Hoot Owl.

43.    In August, 2015, Mark Whittle told Phillip Moran that the SIMMS software (a modeling software which generates site-specific potential for Hooters restaurant sales figures) indicated that the Somerset La Quinta Site would generate

no more than $1.8 million to $2 million in sales per year – well below the $3 million target set forth in the new franchise model propagated by HOA.

44.    Upon information and belief and at all relevant times, Apple Gate and the Azirs were aware the Somerset La Quinta Site and the Flemington La Quinta Site were within Hoot Owl's exclusive development territory.

45.    HOA has imposed a marketing fee on franchisees for years, amounting to 1.5% of sales each year.  These campaigns have been almost completely ineffectual, and as a result of same HOA recently decreased the fee to 0.75%.  The reduced expenditure has not produced viable marketing, however.  Despite knowing its marketing campaigns are useless, HOA continues to unfairly demand funds from franchisees which reduce their profits.

46.    HOA, in a discriminatory fashion, has arbitrarily forced some of its franchisees to remodel existing restaurant locations without an established, proven, or expected return on the significant investment and without a "Renovation Agreement" as required under the 2010 Renewal Amendment to the FA.  The remodel requirements have not been imposed uniformly, either.  Instead, HOA has discriminatorily allowed preferred franchisees exemptions from these outsized expenditures, or permitted lesser changes at far lower cost than HOA required of other franchisees, or HOA owned restaurants.

47.    HOA has never correlated the discriminatory remodeling requirements imposed upon Hoot Owl with increased franchisee profits or sales.  Indeed, the discriminatory remodeling requirements have only decreased Hoot Owl's profitability with no long-term benefit.

48.    HOA franchisees are urged to participate in what is claimed to be a *franchisee*-sponsored, central purchasing office, the Collaborative Purchasing Organization of Hooters of America, LLC ("CPO.")  In fact, the CPO is controlled by HOA, as its chairman, Jim Parrish, is also HOA's COO.  In addition, Kevin Vandiver, the operational chief of the CPO, is a Vice President in HOA's supply chain; Joel Pounds, who is the most-frequent contact person between the CPO and Hoot Owl, is HOA's Director of Logistics and Distribution Operations.  Each of these individuals have offices in HOA's corporate headquarters in Atlanta.  Upon information and belief, Parrish, Vandiver, and Pounds are salaried employees of HOA.  Likewise, the CPO's general counsel is also an employee of HOA.

49.    Based on the foregoing, it is abundantly clear HOA controls the operational and legal decisions of both HOA and the CPO for its own financial (and retaliatory) benefit, to the detriment of all franchisees and Hoot Owl, specifically.

50.    By way of example, HOA and the CPO arrange to allow suppliers to ship up to 30% of traditional wings frozen and maintain frozen chicken wings as back stock, allegedly in case unfrozen chicken wings inventory is depleted.  HOA

and the CPO contracted with suppliers to use frozen "chicken chunks" sold as boneless wings. Essentially, franchisees are required to purchase inferior food product, contrary to HOA's stated policy that Hooters restaurants only sell fresh chicken wings, despite the approved HOA menu with the slogan "Our Wings are Fresh, Never Frozen." Unsurprisingly, this requirement has an adverse effect on customers and sales.

51. Since Hoot Owl filed the New Jersey Action, the CPO has been instructed to make it financially expensive for Hoot Owl to withdraw from the CPO (but Hoot Owl has done so) and obtain required food products which comply with Hooters' system requirements. Upon information and belief, HOA has instructed independent distributors and suppliers who sell HOA-approved products (including HOA's proprietary wing sauce) to not provide services or products to Hoot Owl. As a direct, proximate result of this interference, HOA attempted to force Hoot Owl to violate the FA by either (a) selling inferior product or (b) not selling chicken wings at all – the central component of the Hooter's brand.

52. HOA routinely advertises discount promotions or "Orange Letter Days". For example, on Valentine's Day weekend in 2016, HOA advertised a "Shred Your Ex" promotion whereby customers were encouraged to destroy photos of former partners. Each customer who participated in this promotion received a plate of 10 wings for free. Hoot Owl disliked the concept and advised HOA it did

not want to participate in the promotion. Hoot Owl's objection was simple: Hoot Owl stood to lose significant amounts of money if it participated by giving away free chicken wings, but HOA demanded royalties on those same, free wings as if they had been sold at full price. Moreover, Hoot Owl stood to further lose by paying the required royalties and advertising fees on "100% comped" free food products intentionally mischaracterized by HOA as "sales."

53.    By way of further example, during a recent Veterans Day promotion, HOA advertised free food items for veterans. Desiring to support our veterans, Hoot Owl reluctantly took part in the promotion in order to protect Hooter's good will and its own good will in the community. Ultimately, however, Hoot Owl was required to pay royalties and advertising fees on the comped, free food given away for the promotion for the reasons set forth in the preceding paragraph.

54.    The financial effect of these and other Orange Letter Days and promotions is clear: Hoot Owl's profits were diminished because: (1) it pays the direct and indirect costs associated with the promotion, including its own operating expenses; but also (2) Hoot Owl must also pay HOA attendant royalties and advertising fees on these "phantom sales." This is an unfair, unreasonable, and retaliatory business practice.

55.    Upon information and belief, some of HOA's preferred franchisees have been offered and utilize "ITWerks," a point of sale ("POS") accounting system

custom-developed by third parties and tailored to HOA's business model. Among other things, the software properly accounts for "comp" sales, allowing preferred franchisees to omit this so-called "sales" from those on which it must pay royalties and advertising fees for Orange Letter Days and other promotions. This has the practical and intended effect of saving franchisees money.

56.    Initially, HOA pushed Hoot Owl to purchase the ITWerks program at a considerable expense, but has subsequently refused to permit Hoot Owl to make the purchase. HOA has not provided any reasonable explanation for this unexpected and unfair reversal, however. HOA's unexplained and unsupported reversal has financially damaged Hoot Owl by preventing it from properly managing inventory and sales reporting.

57.    HOA engages a third-party, EcoSure, as its independent food safety compliance organization. EcoSure performs inspections of Hooters restaurants utilizing a protocol which requires it to only conduct inspections when a restaurant is not engaged in a lunch or dinner rush, *i.e.* from 8:30 to 10:30 am and from 2:30 to 4:30 pm Monday through Friday.

58.    Despite these reasonable restrictions, EcoSure inspectors arrived at Hackensack Wings, LLC's Hackensack, New Jersey restaurant during the lunch rush on Sunday, February 14, 2016, during a Valentine's Day promotion. EcoSure's presence greatly disrupted the restaurant business on a day it was already being

forced to participate in an unwanted and costly promotion, but the store passed the inspection, and again passed on Valentine's Day the following year.

59.    Subsequent to the filing of the Second Amended Complaint in April, 2016, HOA has undertaken further steps to undermine Hoot Owl's presence in the system and has violated the NJFPA.

60.    HOA and HILP later filed an amended complaint, on September 2, 2016 naming as additional defendants Hoot Owl principals, Phillip Moran, Gary Givens, and William Hysinger, who executed personal guarantees in connection with the Franchise Agreement.

61.    In their Complaint (as amended), HOA and HILP alleged violations of the Franchise Agreement with respect to the alleged abandonment of Hooters restaurant locations in Rehoboth Beach, Delaware, Warwick, Rhode Island, and Paramus, New Jersey.

62.    In connection with this Georgia Action, on June 6, 2016, HOA issued a Notice of Default and Termination ("Termination Notice") to Hoot Owl regarding the alleged breaches of the Franchise Agreement by abandoning Rehoboth Beach and Warwick. This Termination Notice further purported to terminate Hoot Owl's rights to all of its Pennsylvania restaurant locations under Georgia law.

63.    Warwick Wings, LLC was forced to temporarily close the Warwick Restaurant pursuant to the Governor's Emergency Declaration due to a severe winter

storm in the Winter, 2015. Thereafter, Warwick Wings, LLC reopened and operated the Warwick Restaurant and continued with its remodeling efforts.

64.    During the subsequent remodeling efforts, Warwick Wings, LLC discovered the building had incurred substantial structural damage from the Winter storm and Warwick Wings was forced to close due to that massive storm damage in 2015; its closure has continued due to factors outside Hoot Owl's control, as Warwick Wings, LLC seeks to enforce its claim under its casualty insurance policy. Hoot Owl has routinely communicated to HOA the status of the dispute and the planned renovation of that location.

65.    With regard to Rehoboth Beach, Delaware, Rehoboth Wings, LLC opted to close an underperforming location with the present intent to relocate the restaurant in the Rehoboth Beach area. This closure was done with the knowledge and approval of HOA. The 2016 proposed, new location was ultimately leased to another business; however, Rehoboth Wings, LLC has located a suitable new location for the 2017 season, which location HOA has approved but HOA is unjustifiably requiring Rehoboth Wings, LLC to sign a new Franchise Agreement, with substantially different terms.

66.    In the Second Amended Complaint filed in this action, HOA and HILP specifically note alleged breaches of the Franchise Agreement for the Paramus, New Jersey location, including false and misleading allegations that Hoot Owl abandoned

the Paramus location.  HOA was made aware that P.R. Wings, LLC's lease was ending on June 30, 2016.  P.R. Wings, LLC entered into lease negotiations with the landlord to extend the lease.

67.    While the negotiations were going on, due to the age of the building, the location suffered a number of issues that required P.R. Wings, LLC to temporarily shut down and address those issues.

68.    P. R. Wings, LLC and landlord entered into a lease dated September 7, 2016 which provided for a term at least through June 30, 2017.

69.    Thereafter, P. R. Wings, LLC and the landlord agreed that the cost of the necessary repairs were too much, given the likely short term duration of the lease and P. R. Wings, LLC and the landlord agreed terminate the new lease.

70.    HOA has unjustifiably refused to allow P. R. Wings, LLC to relocate the Paramus Restaurant, despite the language in the Relocation Policy permitting such a relocation.

71.    As with the Warwick and Rehoboth Beach locations, HOA exaggerates and obfuscates; the Paramus location was briefly closed voluntarily due to a health and safety issue involving, among other issues, a broken pipe that required immediate repair.  Hoot Owl advised Jim Marr of HOA of the situation both before and after the decision to close temporarily the Paramus Restaurant, and has since tendered to HOA a new lease for the premises.

72.     HOA refused to consider what steps it would recommend to Hoot Owl to reopen the Paramus operation, claiming that it will not respond to formerly ordinary business inquiries unless Hoot Owl abandons its lawsuit in New Jersey.

73.     On August 10, 2016, HOA sent Hoot Owl a Notice of Additional Default and Termination relating to the alleged closure and condition of the Paramus, New Jersey restaurant.    Such notice improperly and unfairly mischaracterized the status of the Paramus location and violates the NJFPA.

74.     Upon information and belief, the current lawsuit here in Georgia is an improper attempt to harass and retaliate against Hoot Owl and obtain improper leverage in the New Jersey Action.

75.     In addition to the foregoing, Hoot Owl has continued to seek out new, potential restaurant locations to submit to HOA for approval.

## CLAIMS

### COUNT I:
### Injunctive Relief and Restraining Order Against all Counterclaim Defendants

76.     Hoot Owl repeats and incorporates the allegations contained in Paragraphs 1through 75 above of its Counterclaim as if set forth fully herein.

77.     Hoot Owl has been and continues to be irreparably harmed and has no adequate remedy at law.

78.    Counterclaim Defendants' actions constitute breach of the Franchise Agreement and Option Agreements, entitling Hoot Owl to a restraining order, and temporary and permanent injunctions, restraining and enjoining all Counterclaim Defendants from violation of the Agreements, including the development of the Flemington La Quinta Site by Applegate/Azirs.

79.    Contrary to the NJFPA, HOA has begun discriminating against Hoot Owl for asserting and exercising its rights under the NJFPA.  HOA has commenced imposing new requirements upon Hoot Owl which it had never asserted throughout the many years of the Parties' business relationship.   These new requirements include, but are not limited to: (1) overly punitive location redevelopment requirements contrary to prior practice, and (2) requiring approvals on Hoot Owl advertisements, which HOA had never required in the Parties' long course of dealings.

80.    HOA's discrimination against Hoot Owl for exercising its rights under the NJFPA are, themselves, a violation of the NJFPA.  As a result of same, HOA ought to be enjoined from further and future violations of the NJFPA or otherwise discriminating against Hoot Owl for lawfully exercising its rights under the law.

81.    HOA should also be enjoined from preventing Hoot Owl from obtaining approved food product from approved vendors at contract pricing.

<u>**COUNT II:**</u>
**Declaration of Rights Against HOA**

82.    Hoot Owl repeats and incorporates the allegations contained in Paragraphs 1 through 75 above of the Counterclaim as if set forth fully herein.

83.    Hoot Owl is entitled to a declaration of the Parties' rights and obligations under the Franchise, 2009, and 2011 Agreements, as well as any and all other Agreements as applicable, including specifically that Counterclaim Defendants' past and contemplated future actions constitute a breach of those Agreements.

84.    Hoot Owl is also entitled to a declaration that HOA cannot impose unreasonable advertising requirements in violation of the NJFPA, location closing penalties, or unreasonable and inconsistent remodeling requirements on existing locations as a prerequisite to exercising its option rights, or impose penalties for not completing renovation projects.

## COUNT III:
### Breach of the New Jersey Franchise Practices Act Against the HOA Defendants

85.    Hoot Owl repeats and incorporates the allegations contained in Paragraphs 1 through 75 above of the Counterclaim as if set forth fully herein.

86.    A great disparity of bargaining power exists and has existed between Hoot Owl and HOA.

87.    HOA terminated some of Hoot Owl's rights existing under the various Agreements identified elsewhere herein without good cause and without the requisite notice under the NJFPA.

88.    Following its improper termination of Hoot Owl's rights under the Agreements, HOA improperly and unlawfully sold some of those rights to another potential franchisee without notice to Hoot Owl, in violation of the NJFPA.

89.    HOA imposed impossible and nebulous development and other standards on Hoot Owl and conveyed conflicting information, making it impossible for Hoot Owl to meet HOA's alleged expectations.  HOA told franchisees, like Hoot Owl, HOA would not approve new restaurants that were not forecast to gross at least $3 million in sales annually, but thereafter HOA proceeded to approve a new Hooters restaurant in Somerset which HOA knows will not realistically come anywhere close to its $3 million metric.

90.    Further, HOA advised Hoot Owl to cease meeting the expansion requirements set forth in the 2009 and 2011 Agreements and any other Agreements' development deadlines while it revised its franchise model in violation of the NJFPA; and thereafter reversed itself and is now asserting a right to terminate Hoot Owl's exclusive, territorial rights because Hoot Owl allegedly failed to meet the development deadlines HOA intentionally relaxed and excused.

91.    HOA also improperly imposed unreasonable and inconsistent advertising requirements, has threatened to assess location closing penalties, and imposed unreasonable, discriminatory, and inconsistent remodeling and control requirements on existing locations as a prerequisite to exercising its option and other rights, each of which violates the NJFPA.

92.    Additionally, in retaliation for the filing of the New Jersey Action and Hoot Owl's other perceived misdeeds, HOA has conspired with the CPO and repeatedly forced Hoot Owl to buy undesirable product and in so doing, has forced Hoot Owl to withdraw from the CPO and then HOA has interfered with Hoot Owl being able to purchase approved product at contract pricing from independent, third party vendors.

93.    To further impose unreasonable standards of performance, upon information and belief, HOA has engaged outside compliance organizations such as EcoSure to conduct inspections of Hoot Owl restaurants during Sundays and promotional days and to harass Hoot Owl's affiliates' employees.

94.    HOA refused to permit Hoot Owl access to the ITWerks software, which permits franchisees granted access to the system the ability to omit HOA mandated Orange Letter Days sales from commission requirements. By refusing the grant access to this software, HOA intentionally has caused damages to Hoot Owl and has improperly profited from same.

95.    Hoot Owl has been, and continues to be, irreparably harmed by HOA's action in violation of the NJFPA.

## COUNT IV:
### Breach of Written Contracts Against HOA

96.    Hoot Owl repeats and incorporates the allegations contained in Paragraphs 1 through 75 above of the Counterclaim as if set forth fully herein.

97.    As set forth at length elsewhere herein, the Parties' entered into several Agreements over the course of the past twenty-odd years.

98.    Hoot Owl has performed each and every obligation under these Agreements or has had its performance excused by HOA.

99.    Counterclaim Defendants' actions, as set forth and described elsewhere herein, violate and breach the Parties' long-standing course of performance under the applicable Agreements.

100.    As a direct and proximate result of HOA's breaches of the various Agreements, Hoot Owl has been damaged.

## COUNT V:
### Breach of Oral Agreement Against HOA

101.    Plaintiff repeats and incorporates the allegations contained in Paragraphs 1 through 75 above of the Counterclaim as if set forth fully herein.

102.   The Parties engaged in a series of oral agreements, initiated by representatives of HOA including, but not limited to, Allan Karp and Terry Marks, such as have been described elsewhere herein.

103.   Hoot Owl performed its obligations under these oral agreements.

104.   HOA breached its obligations under these oral agreements.

105.   HOA's breaches violate the Parties' long-standing course of performance under the oral agreements.

106.   As a direct and proximate result of HOA's breach, Hoot Owl has suffered damages.

## COUNT VI:
### Promissory Estoppel and Detrimental Reliance Against HOA

107.   Hoot Owl repeats and incorporates the allegations contained in Paragraphs 1 through 75 above of the Counterclaim as if set forth fully herein.

108.   HOA made clear and definite promises regarding the Development Schedule, 2009 and 2011 Agreement deadlines, such that these deadlines were of no consequence because HOA was reassessing and adjusting the parameters and requirements for new and existing stores, in an effort to create a more lucrative franchise model.

109.   Hoot Owl relied on these promises, waiting for new requirements to be completed and uniformly implemented.

110.   Hoot Owl evaluated and declined to pursue the Somerset La Quinta Site that HOA subsequently granted to the Azirs and Apple Gate precisely because Hoot Owl reasonably believed, based on HOA's statements and conduct, that Hoot Owl would not be successful under the new Hooters model in that location because the location could not generate at least $3 million dollars in sales annually.

111.   Hoot Owl detrimentally relied upon HOA's statements and conduct in that it lost the opportunity to open the Somerset La Quinta Site and now unfairly stands accused of not meeting development goals by HOA as set forth under the 2009 and 2011 Agreements and its development rights under those Agreements and the others referenced elsewhere herein have been improperly and unlawfully terminated by HOA as a direct and proximate result.

112.   HOA has improperly and in violation of the Parties' Agreements sold the La Quinta Site to the Azirs and Apple Gate.

113.   For these reasons, Hoot Owl has been damaged as a result of its detrimental reliance on HOA's conduct and statements.

### COUNT VI:
### Equitable Estoppel

114.   Hoot Owl repeats and incorporates the allegations contained in Paragraphs 1 through 75 above of the Counterclaim as if set forth fully herein.

115.   The doctrine of equitable estoppel is "designed to prevent injustice by not permitting a party to repudiate a course of action on which another party relied

to his detriment." HOA's current and past conduct is, in fact, a repudiation of its actions, i.e., its statements to Hoot Owl and other franchisees that the end dates for development of its option territories would not be observed.

116. Hoot Owl, reasonably relying upon these statements made by HOA, did not meet the development deadlines set forth in the various Agreements.

117. To thereafter hold Hoot Owl to the development goals and deadlines HOA publicly and privately announced were relaxed and would not be observed for an indefinite period, would create a substantial injustice upon Hoot Owl.

118. HOA should be deemed equitably estopped from both enforcement of the development deadlines set forth in the various Agreements and claiming it was able to sell Hoot Owl's development rights to a third party as a result of Hoot Owl's reliance and forbearance from completing its development goals under those same Agreements.

119. As a direct and proximate result of HOA's statements and conduct as set forth herein, Hoot Owl has suffered damages.

## <u>COUNT VIII</u>:
### Breach of Implied Covenant of Good Faith and Fair Dealing Against HOA

120. Hoot Owl repeats and incorporates the allegations contained in Paragraphs 1 through 75 above of the Counterclaim as if set forth fully herein.

121.   Implicit in every contract is a covenant to act in good faith and deal fairly, meaning that neither party is to do anything (or fail to do anything) which deprives its contract partner of the fruits and benefits of its contract.

122.   By improperly abandoning Hoot Owl in favor of the Azirs and Apple Gate and terminating Hoot Owl's exclusive, territorial rights in the manner described elsewhere herein in a naked attempt to obtain increased, additional franchise fees, by preventing Hoot Owl from obtaining food and other approved products from approved vendors, and by refusing to grant Hoot Owl access to and/or the right to purchase the ITWerks POS system, HOA breached its covenant of good faith and fair dealing with Hoot Owl.

123.   As a direct and proximate result of HOA's breaches, Hoot Owl has suffered damages.

## <u>COUNT IX</u>:
## Fraud Against HOA

124.   Hoot Owl repeats and incorporates the allegations contained in Paragraphs 1 through 75 above of the Counterclaim as if set forth fully herein.

125.   HOA made certain statements and representations to Hoot Owl and other franchisees as set forth elsewhere herein.

126.   HOA made these statements and representations to Hoot Owl knowing Hoot Owl would reasonably believe and rely upon same.

62

127.   HOA's statements and representations amounted to a course of conduct which was and is contrary to HOA's current course of conduct, namely to claim defaults in the Agreements.

128.   As set forth in greater detail elsewhere herein, Hoot Owl's alleged defaults were the direct and proximate result of HOA's statements and representations that Hoot Owl could relax and in some cases forego performance of certain obligations under the various Agreements because HOA was not in a position to (and had no present desire to) have those obligations performed by Hoot Owl.

129.   HOA's statements and representations were intended by HOA to be accepted as genuine and actionable by Hoot Owl.

130.   HOA's later course of conduct indicates it never intended to honor those statements and representations made over the course of the Parties' relationship.

131.   By acting in a manner contrary to its intentions, HOA has materially omitted and/or otherwise misstated relevant factual information.

132.   Hoot Owl did in fact reasonably rely upon HOA's statements and representations.

133.   As a result of this reliance, HOA now claims that Hoot Owl has lost its exclusive rights to develop all or part of its territories in New Jersey, Delaware, Rhode Island, and a portion of eastern Pennsylvania.

134.    As a direct and proximate result of these material misstatements and/or omissions, Hoot Owl has suffered damages.

## COUNT X:
### Violation of the New Jersey Anti-Trust Act Against HOA

135.    Hoot Owl repeats and incorporates the allegations contained in Paragraphs 1 through 75 above of the Counterclaim as if set forth fully herein.

136.    HOA and the CPO contracted, conspired and/or combined forces to discriminate against Hoot Owl and/or make it impossible for Hoot Owl to purchase the requisite Hooter's food product or, in the alternative, purchase approved food product from approved vendors at prohibitive prices designed to prevent Hoot Owl from making a reasonable profit.

137.    This conspiracy was designed to, and succeeded in, effecting an anti-competitive business atmosphere for Hoot Owl within the Hooters' system, New Jersey as a whole, and casual dining restaurant markets.

138.    HOA's conduct, including the conspiracy with the CPO, is illegal within the meaning of the New Jersey Anti-Trust Act ("NJAA"), N.J. Stat. Ann. §56:9-1 *et seq*.

139.    As a direct and proximate result of HOA's and CPO's conduct, Hoot Owl has suffered damages.

## COUNT XI:
### Interference with Prospective Contract Against HOA

140.    Plaintiff repeats and incorporates the allegations contained in Paragraphs 1 through 75 above of the Counterclaim as if set forth fully herein.

141.    HOA knew Hoot Owl was attempting to contract with Hooters' approved, third party vendors to purchase Hooters' approved products outside the influence of the CPO.

142.    Upon information and belief, HOA instructed, coerced, or otherwise convinced these third party vendors to cease, discontinue, or otherwise cancel any business relationships they may have had with Hoot Owl.

143.    Upon information and belief, HOA's interference with Hoot Owl's creation of an alternative supply chain, without justification, was due to Hoot Owl's filing of the instant action.

144.    As a direct and proximate result of HOA's actions, Hoot Owl has suffered damages.

<u>**COUNT XII:**</u>
**Violations of the New Jersey Franchise Practices Act Against HOA**

145.    Hoot Owl repeats and incorporates the allegations contained in Paragraphs 1 through 75 above of the Counterclaim as if set forth fully herein.

146.    Subsequent to the filing of the Second Amended Complaint in the New Jersey Action in April, 2016, HOA and its related companies engaged in a retaliatory action against Hoot Owl and its members by filing this Georgia Action.

147.   In addition, HOA violated the NJFPA by improperly attempting to terminate franchises in Pennsylvania, Delaware and Rhode Island which operate under the Franchise Agreement, 2009 Agreement, 2011 Agreement, and other, related Agreements between the parties.  Each and every one of these contracts is interrelated and connected, each with the other, and they are effectively inseparable.

148.   Necessarily, each and every Agreement set forth and described in this Counterclaim derives from the initial Franchise Agreement, including any and all area development agreements.  As such, any area development rights, or franchise locations opened and operated by Hoot Owl thereunder, are subject to the Franchise Practices Act because Hoot Owl is primarily a New Jersey franchisee operating franchised locations in New Jersey with an optioned territory that includes all of New Jersey, as well as some surrounding geographic areas, such as a portion of Pennsylvania, Delaware, and Rhode Island.

149.   The Pennsylvania, Delaware, and Rhode Island franchise locations owned and operated by affiliates of Hoot Owl do not now, and have never since Hoot Owl's involvement therein, been subject to separate individual franchise agreements.   Rather, they have always been subject to the single Franchise Agreement.

150.   Therefore, any and all area development agreements between Hoot Owl and HOA are subject to the NJFPA.

151.   HOA has, by operation of a letter sent June 6, 2016, allegedly terminated all of the franchised restaurants operated by Hoot Owl's affiliates in Pennsylvania, Rhode Island, and Delaware by a "cross-termination" in one or more of the Agreements.  Thereafter, HOA sent a second termination letter with respect to the temporary closure of the Paramus location.

152.   HOA has improperly effected these terminations in derogation of the NJFPA by failing to give the required, sixty (60)-day notice period as required under the NJFPA.

153.   In addition to the foregoing, HOA has required the various franchise locations to meet unreasonable standards of performance, including but not limited to: requiring Hoot Owl's participation in Orange Letter Days and other promotions, refusing access to ITWerks, and interfering with Hoot Owl's ability to source quality, approved product for customers.

154.   As a direct and proximate result of these actions, Hoot Owl has suffered damages.

## COUNT XIII:

## Violation of the Delaware Franchise Security Act

155.   Hoot Owl repeats and incorporates the allegations contained in Paragraphs 1 through 75 above of the Counterclaim as if set forth fully herein.

156.   Hoot Owl's affiliate Rehoboth Wings, LLC's Rehoboth Beach, Delaware franchise restaurant is further protected by Delaware's franchise relationship law, the Delaware Franchise Security Act ("DFSA").

157.   The DFSA prohibits, among other things, the "unjust" termination of a franchise covered by the Act.

158.   HOA's wholesale termination of Hoot Owl's entire system of franchises, including the Rehoboth Beach location, was unjust and in bad faith.

159.   As a direct and proximate result of HOA's improper and unlawful termination of Hoot Owl's Rehoboth Beach location, Hoot Owl has suffered damages.

## COUNT XIV:
## Unfair Practices

160.   Hoot Owl repeats and incorporates the allegations contained in Paragraphs 1 through 75 above of the Counterclaim as if fully set forth herein.

161.   Counterclaim Defendants, by their actions set forth above, have engaged in unfair practices against Hoot Owl which have caused damages to Hoot Owl.

## COUNT XV:
## Civil Conspiracy

162.   Hoot Owl repeats and incorporates the allegations contained in Paragraphs 1 through 75 above of the Counterclaim as if fully set forth herein.

163.    Counterclaim Defendants, by their agreements and actions as set forth above, have engaged in a civil conspiracy to violate Hoot Owl's exclusivity benefits and to harm Hoot Owl.

**WHEREFORE**, and for the foregoing reasons, Counterclaim Plaintiff Hoot Owl demands relief as follows:

A.    a restraining order and preliminary and permanent injunctive relief restraining and enjoining HOA from violating the Franchise Agreement, 2009 Agreement, 2011 Agreement, and other Agreements;

B.    a restraining order and preliminary and permanent injunctive relief restraining and enjoining HOA, from any other area development by the Azirs, Apple Gate, or any other entity;

C.    a restraining order and preliminary and permanent injunctive relief restraining and enjoining HOA from terminating Hoot Owl's franchise restaurants in New Jersey, Pennsylvania, Rhode Island, and Delaware in violation of the NJFPA;

D.    a restraining order and preliminary and permanent injunctive relief restraining and enjoining HOA from proceeding with this litigation in violation of the New Jersey Entire Controversy Doctrine;

E.    reasonable attorney's fees and costs of suit under the applicable Agreements, the NJFPA, and the NJAA;

F.    compensatory, consequential, and future damages/profits;

G.    punitive damages;

H.    a declaration of the Parties' rights under the Agreements and with respect to the development rights of the Somerset and Flemington La Quinta Sites; and

I.    any and all further relief this Court believes is equitable and just under the circumstances.

s/*Brendan J. McCarthy*_____
Brendan J. McCarthy
Georgia Bar No. 482221
Luke A. Kill
Georgia Bar No. 457555
Attorneys for Defendants

**Andre Kill & McCarthy, LLP**
One Overton Park, Suite 980
3625 Cumberland Blvd.
Atlanta, GA  30339
(404) 653-3004 (Direct)
(404) 653-0338 (Facsimile)
bmccarthy@ablaw.net

## LOCAL RULE 7.1 CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing, **ANSWER AND COUNTERCLAIM OF HOOT OWL RESTAURANTS, LLC** has been prepared in conformity with the formatting requirements set forth in Local Rule 5.1. The foregoing pleading was prepared with Times New Roman (14 point) type.

This 7th day of March, 2017.

*s/ Brendan J. McCarthy*

Brendan J. McCarthy

Georgia Bar No. 482221

Luke A. Kill

Georgia Bar No. 457555

Attorneys for Defendants

**Andre Kill & McCarthy, LLP**
One Overton Park, Suite 980
3625 Cumberland Blvd.
Atlanta, GA  30339
(404) 653-3004 (Direct)
(404) 653-0338 (Facsimile)
bmccarthy@ablaw.net

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have this day served a copy of the within and foregoing

**ANSWER AND COUNTERCLAIM OF HOOT OWL RESTAURANTS, LLC**

upon all parties to this matter by electronically filing a copy of same with the Court's

CM/ECF system, which will automatically send an electronic copy to all counsel of

record.

This 7th day of March, 2017.

*s/ Brendan J. McCarthy_____*
Brendan J. McCarthy
Georgia Bar No. 482221
Luke A. Kill
Georgia Bar No. 457555
Attorneys for Defendants

**Andre Kill & McCarthy, LLP**
One Overton Park, Suite 980
3625 Cumberland Blvd.
Atlanta, GA  30339
(404) 653-3004 (Direct)
(404) 653-0338 (Facsimile)
bmccarthy@ablaw.net